UNITED STATES of America, Appellant,

v.

PENNSYLVANIA ENVIRONMENTAL HEARING BOARD, Robert Broughton, Paul E. Waters, and Ray A. Alberigi, Prothonotary of Lackawanna County, Appellees.

No. 77–2041.

United States Court of Appeals, Third Circuit.

Argued March 30, 1978.

Decided Aug. 14, 1978.

James Hunter, III, Circuit Judge, dissented and filed opinion.

James W. Moorman, Acting Asst. Atty. Gen., Washington, D. C., S. John Cottone, U. S. Atty., James W. Walker, Asst. U. S. Atty., Scranton, Pa., Raymond N. Zagone, Carl Strass, Attys., Dept. of Justice, Washington, D. C., for appellant.

Dennis Jay Harnish, Karin W. Carter, Asst. Attys. Gen., Harrisburg, Pa., for appellees.

Before HUNTER, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This appeal requires us to determine whether a private company operating under federal contract is a federal "department, agency or instrumentality" for the purposes of section 313 of the Federal Water Pollution Control Act Amendments of 1972 (Act).[1] That provision requires *inter alia* that a federal "department, agency or instrumentality" comply with State and local pollution control requirements "to the same extent that any person is subject to such requirements."

The district court determined that Chamberlain Manufacturing Corporation (Chamberlain), the company whose operations and whose relationship to the Government is involved here, is a private independent contractor and not a federal agency for purposes of section 313. That holding resulted in the district court granting the summary judgment motion brought by the Pennsylvania Environmental Hearing Board (Board). 431 F.Supp. 747 (M.D.Pa.). We affirm.

### I

The United States owns the premises, installations and equipment at the Scranton Army Ammunition Plant (Plant) in Scranton, Pennsylvania. The primary function

1. At the time relevant to the events which underlie this appeal, § 313 of the Act reads as follows:

Federal facilities pollution control

Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants shall comply with Federal, State, interstate, and local requirements respecting control and abatement of pollution to the same extent that any person is subject to such requirements, including the payment of reasonable service charges. The President may exempt any effluent source of any department, agency, or instrumentality in the executive branch from compliance with any such a requirement if he determines it to be in the paramount interest of the United States to do so; except that no exemption may be granted from the requirements of section 1316 or 1317 of this title. No such exemptions shall be granted due to lack of appropriation unless the President shall have specifically requested such appropriation as a part of the budgetary process and the Congress shall have failed to make available such requested appropriation. Any exemption shall be for a period not in excess of one year, but additional exemptions may be granted for periods of not to exceed one year upon the President's making a new determination. The President shall report each January to the Congress all exemptions from the requirements of this section granted during the preceding calendar year, together with his reason for granting such exemption. Pub.L.No.92–500, § 2, 86 Stat. 875 (1972) (prior to 1977 Amendments) (*codified at* 33 U.S.C.A. § 1323 (Supp.1977)) (current version at 33 U.S. C.A. § 1323 (Feb. 1978 Supp.), *quoted in* n.24 *infra*). *See* n.20 *infra*.

of the Plant is the production of metal parts for ammunition shells used solely by the United States.[2] Chamberlain, an Iowa corporation having a certificate of authority to do business in Pennsylvania, operates the Plant under a facilities contract with the United States.[3] That contract designates Chamberlain as "an independent contractor and not an agency of the Government,"[4] and provides that the personnel employed "in carrying out the work hereunder . . shall constitute employees of the Contractor [Chamberlain] and not of the Government."[5]

From July, 1970 through October, 1972, the operation of the plant by Chamberlain resulted in the discharge of 1.5 million gallons per day of untreated wastes from the Plant into Roaring Brook, a tributary of the Lackawanna River. "As a result of the industrial waste discharge, no fish could have lived within a half mile of the plant, and the lower life forms were also depressed."[6]

During this period, "Chamberlain knew that its operation of the plant and the attendant discharge of industrial wastes from the plant caused substantial pollution of Roaring Brook."[7] Chamberlain however was not unresponsive: commencing in 1966 and at least through October, 1972, Chamberlain engaged in a series of pollution abatement measures which, by October, 1972, resulted in abatement of the Plant's industrial waste discharge.

The parties stipulated that in order to receive reimbursement from the United States for its pollution control programs, Chamberlain required the approval of the Department of the Army prior to their implementation.[8] The facilities contract between the Government and Chamberlain nonetheless specified that Chamberlain was to comply with *all* governmental laws and regulations, and was to "procure all necessary permits and licenses," *including those of state and local authorities.*[9] Additionally the facilities contract contains a specific section dealing with Chamberlain's responsibility to comply with state pollution control laws, and provides among other things that "[i]n the event any Governmental agency, local, state or federal, shall assess fines, institute suit, or otherwise disrupt, curtail, or order cessation of production, *the Government shall hold harmless and indemnify the contractor for costs and damages incurred.*"[10]

In 1972, the Pennsylvania Department of Environmental Resources (Department) filed a complaint for civil penalties for water pollution with the Board against Chamberlain and other defendants.[11] The

2. The parties to the district court proceeding agreed upon virtually all the facts relevant to that proceeding. Their stipulation took the form of 65 findings of fact and is reproduced *in haec verba* in the district court opinion. 431 F.Supp. at 749–53.

3. The parties stipulated and the district court thereupon found that "Chamberlain *operates* the Scranton Army Ammunition Plant under a facilities contract with the United States of America" (emphasis added). *Id.* at 749, Finding No. 4.

4. Contract No. DA–36–034–AMC–0163A, Exhibit "A", ¶ 1 (covering June 13, 1963 through June 30, 1971) (District Court Docket # 79); *accord,* 431 F.Supp. at 754.

5. Contract No. DA–36–034–AMC–0163A, pt. I, ¶ 3 (covering June 13, 1963 through June 30, 1971) (District Court Docket # 79).

6. 431 F.Supp. at 750, Finding No. 21.

7. *Id.,* Finding No. 22.

8. *Id.,* at 751, Finding No. 43.

9. Contract No. DA–36–034–AMC–0163A, art. VI, ¶ 1 (covering June 13, 1963 through June 30, 1971) (District Court Docket # 79) provides that:

> The Contractor shall procure all necessary permits and licenses; obey and abide by all applicable laws, regulations and ordinances and other rules of the United States of America, of the state, territory, or subdivision thereof wherein the work is done, or of any other duly constituted public authority.

10. Contract No. DAAA09–71–C–0257, at 47, art. IV–D, ¶ 3 (effective July 1, 1971) (District Court Docket # 80) (emphasis added).

11. The original defendants in the State Board action were three: Robert E. Froehlke, the Secretary of the Army; Lt. Col. Daniel E. Duggan, the Commanding Officer of the facility; and

complaint alleged violations of the Pennsylvania Clean Streams Law,[12] and sought money damages pursuant to the 1970 Amendments to that act. None of the defendants filed an answer. On October 19, 1972, the Board entered a default judgment against Chamberlain and the commanding officer of the facility. (App. 17, 35).

At a subsequent penalty hearing, an Assistant United States Attorney made a limited appearance on behalf of all defendants. He argued that under the doctrine of sovereign immunity the Board lacked jurisdiction to " 'impose fines or penalties upon federal employees or federally operated facilities . . ..' "[13] The Board denied the Government's objection to the Board's assertion of jurisdiction. This jurisdictional objection constituted the full extent of the Government's participation in Board proceedings.[14] The Board went on to assess a $1,667,000 fine against Chamberlain.

Following the Board's decision, the United States filed a complaint in the federal district court, seeking an injunction to prevent the Department's enforcement and collection of the fine levied against Chamberlain.[15] The parties stipulated to the relevant facts,[16] and the case was heard upon a motion for summary judgment brought by the Board.

Aware of the dismissals and stipulations affecting the other defendants,[17] the district court considered the United States'

---

Chamberlain. The complaint against the Secretary was dismissed by the Board for want of personal jurisdiction. App. 38. The complaint against Lt. Col. Duggan, while upheld by the Board, was withdrawn in the district court by stipulation of the parties. App. 39. Thus, Chamberlain is the sole party against whom the Board's fine was levied.

**12.** Pa.Stat.Ann. tit. 35, §§ 691.1 *et seq.* (Purdon 1977).

**13.** 431 F.Supp. at 752, Finding No. 57.

**14.** The Board addressed the sovereign immunity issue as follows:

> Whether the action is so barred depends upon whether the individual Defendants can be said to have been violating the Clean Streams Law and the regulations promulgated thereunder in the course of their duties as federal officials and contractors, or whether in doing so they were acting outside the scope of their duties as federal officials.
>
> If the Defendant [sic] were acting entirely outside the scope of their authority, then the suit cannot be viewed as one against the United States.

Board Op. at 6–7, *reproduced at* App. 22–23. The Board concluded that the defendants' conduct was *beyond* the scope of their authority as agents of the United States, and to that extent jurisdiction to assess civil penalties was not barred by sovereign immunity (App. 28).

**15.** The United States also sought review of the Board's decision through the prescribed channels: an appeal to the Pennsylvania Commonwealth Court. As represented to us at the oral argument of this case, that appeal to the Commonwealth Court was quashed as untimely filed. Thus no state proceeding is presently pending, and we are therefore not confronted with the question as to whether these federal civil proceedings should be dismissed under the comity doctrine of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny. For a general discussion of the applicability of *Younger* to civil proceedings, see Note, Younger *Grows Older: Equitable Abstention in Civil Proceedings,* 50 N.Y.U.L.Rev. 870 (1975). Nor are we here faced with a question of abstention under *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). *See generally* Field, *Abstention in Constitutional Cases: The Scope of the* Pullman *Abstention Doctrine,* 122 U.Pa.L.Rev. 1071 (1974). Neither have the parties on appeal raised or argued the question of whether the now-final determination of the Pennsylvania Environmental Hearing Board precludes further inquiry into the matters raised on this appeal under principles of *res judicata. See United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 421–22, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); *Seatrain Lines, Inc. v. Pennsylvania R. Co.,* 207 F.2d 255 (3d Cir. 1953) (giving *res judicata* effect to a decision of the Interstate Commerce Commission). We therefore do not treat with this question. For discussions of the applicability of the doctrine of *res judicata* to administrative decisions, see *Painters Dist. Council No. 38 v. Edgewood Contracting Co.,* 416 F.2d 1081 (5th Cir. 1969); 2 K. Davis, Administrative Law Treatise ch. 18 (1958 & Supp.1970) (the applicability of *res judicata* to administrative judgments may depend upon many factors, including *inter alia* the agency's expertise in deciding the particular issue, the legislative intent concerning the allocation of decision-making, and the fullness and fairness of the agency litigation).

**16.** *See* n. 2 *supra.*

**17.** *See* n. 11 *supra.*

claim of immunity solely as it related to Chamberlain. The court did not confine itself to the *ratio decidendi* found in the Board's decision, as it was not sitting as a court reviewing Board determinations. Rather, the district court focused on the facilities contracts pursuant to which Chamberlain contracted to operate the Scranton Army Ammunition Plant.[18] As noted "the two contracts . . . denominate Chamberlain 'an independent contractor and not an agency of the Government' and employ language fully consistent with that characterization." 431 F.Supp. at 754. The question before the district court thus became whether Chamberlain, which concededly operated the plant and indeed was named as an "independent contractor" in all relevant documents to which it was a party and which were pertinent to its function as Plant operator, was nonetheless a United States "department, agency, or instrumentality" within the meaning and terms of section 313. If so, then upholding the Government's sovereign immunity contention would result both in the district court being the exclusive forum for any action instituted against Chamberlain and in the disallowance of any fine. See n. 20 *infra.* If not, *i. e.,* if Chamberlain was not a federal entity under section 313, then Chamberlain, like any other private company, was subject to the jurisdiction of, and sanctions imposed by, the Board.

18. Contract DA–36–034–AMC–0163A (District Court Docket # 79) covered the period from June 13, 1963 through June 30, 1971. Contract DAAA09–71–C–0257 (District Court Docket # 80) covers July 1, 1971 through at least the date of the district court decision. 431 F.Supp. at 749, Finding Nos. 5 & 6.

19. 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017 (1950). In *Powell* the Supreme Court ruled that employees of an independent contractor who manufactured munitions for the federal government were *not* federal employees; nor was the contractor a federal agency. Hence the Court held that the employees were not excluded from coverage under the minimum wage and maximum hour provisions of the Fair Labor Standards Act. The district court recognized, as do we, that *Powell* presents a situation highly analogous to the instant case. *See* pp. 1278–1280 *infra.*

The district court, after an examination of policy considerations and relevant authorities, particularly *Powell v. United States Cartridge Company,*[19] concluded that as a matter of federal law Chamberlain was not shielded from state environmental proceedings merely because it was operating under a contract made with the federal government. The district court reasoned:

To include Chamberlain, an independent contractor, within [the] definition [of "department, agency, or instrumentality"] would not only strain the literal language, but would, by extending a partial shield to the vast number of companies which do business under contract with the Government, flout the environmental concerns which gave impetus to the Air and Water Acts. Those statutes, rather than erecting new obstacles to enforcement, exposed to suit in a specific forum the otherwise immune activities of strictly governmental agencies.

431 F.Supp. at 755. The district court therefore refused to enjoin the Board's order prescribing a penalty against Chamberlain. *Id.*

## II

■ We agree with the district court that Chamberlain is not a federal "department, agency, or instrumentality" under section 313 of the Act.[20]

The district court found further support for its position in *Keifer & Keifer v. Reconstruction Finance Corp.,* 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784 (1939), and in two court of appeals cases which declined to extend immunity from tort liability to private munitions manufacturers who were "intimate[ly] connect[ed]" with the Federal Government. 431 F.Supp. at 754, *citing Foster v. Day & Zimmermann, Inc.,* 502 F.2d 867 (8th Cir. 1974) *and Whitaker v. Harvell-Kilgore Corp.,* 418 F.2d 1010 (5th Cir. 1969).

20. It is unclear to us precisely what advantages would accrue to a federal "department, agency or instrumentality" under the unamended version of § 313, *quoted in* n. 1 *supra.* The statute provides that a federal entity must comply with pollution control and abatement "requirements" "to the same extent that any person is subject to such requirements." This language would seem to erase any distinction between

We find it critical that Chamberlain's contract with the federal government specifies that it is "an independent contractor and not an agency of the Government," and that its employees are not government employees.[21] By contrast, the pollution control requirements prescribed in section 313 apply to a federal "department, agency or instrumentality." This statutory terminology seems logically to *exclude* an independent contractor. If there is an ambiguity in the terms of the statute, however, that ambiguity disappears when reference is made to the explicit contractual language of the parties which carefully denotes Chamberlain to be an independent contractor and "not an agency of the Government."

■ Admittedly, contract provisions do not necessarily govern a party's legal status vis-a-vis third parties (here the Board). Yet here the language of the contracting parties is unmistakably clear, and in our opinion was specifically intended to establish the status of the one in relation to the other. In the context of this case, in which the Government would have Chamberlain cloak itself with the mantle of a federal "department, agency or instrumentality" and thereby gain governmental immunity with respect to third parties, the relevant contract terms assume an enhanced significance.

Indeed, in a highly analogous context the Supreme Court found nearly-identical contract language to be "persuasive" and virtually determinative of the issue before it. In *Powell v. United States Cartridge Co.,* 339 U.S. 497, 505–06, 70 S.Ct. 755, 94 L.Ed. 1017 (1950), a private company under contract with the United States claimed that it was a Government agent, and that its em-

ployees were Government employees, thereby exempting the employees from the minimum wage and maximum hour provisions of the Fair Labor Standards Act as amended, 29 U.S.C. §§ 201 *et seq.* In *Powell,* as here, the private company was a munitions manufacturer which operated a plant owned by the United States. There as here, the company's work was directed toward producing ammunition solely for the Government, a process whereby the end product as well as the raw materials were owned by the Government. There as here, the relevant contract between the Government and the company designated the company as an independent contractor and *not* a Government agent. There, as here, the contractor claimed to be shielded from a statute which affected and sought to regulate aspects of health and welfare. Finally, the very issue raised in *Powell* (whether the contractor's employees were those of the contractor or of the Government) has, in this case, been unequivocally determined by the actions of the contracting parties when they agreed that all employees were those of Chamberlain and not of the Government.

The Supreme Court in *Powell* reasoned:

> The contract in the *Powell* case contained the following additional clause:
> "Article III–A–Status of Contractor.
> "It is expressly understood and agreed by the Contractor and the Government that in the performance of the work provided for in this contract, *the Contractor is an independent contractor and in no wise an agent of the Government.*" (Emphasis supplied.)
> Such provisions are persuasive that the petitioners [employees] should be recognized here as employees of the respective

---

the treatment of federal and nonfederal entities. *See* S.Rep.No.414, 92d Cong., 1st Sess. 67, *reprinted in* [1972] U.S.Code Cong. & Admin. News, pp. 3668, 3733–34, *quoted in* n. 26 *infra.* Yet in two cases of now questionable vitality, the Supreme Court has rejected this interpretation, and ruled that any waiver of sovereign immunity must be clearly stated and strictly construed. *See* n. 22 *infra.* Presumably therefore, under the unamended statute and under traditional notions of sovereign immunity, a federal agent is (at the least) immune from an

environmental enforcement proceeding unless brought in federal court, and could not be fined in any forum. *See* 431 F.Supp. at 754–55.

Under the *amended* § 313, *quoted in* n. 24 *infra,* the status of such a federal entity is clear. It must conform to all "substantive or procedural" pollution requirements; it may be sued in any forum but retains a right of removal to federal court; and its immunity from fines is recognized.

**21.** *See* p. 1274 & nn. 4–5 *supra.*

respondents [private companies], and the respondents as independent contractors. The respondents argue, however, that the context of the times, other provisions of the contracts and the practice under the contracts deprive these statements of their ordinary meaning. We find, on the contrary, that each of these sources supplies additional evidence that these provisions correctly state the true relationship between the petitioners and respondents.

For example, we find in these contracts a reflection of the fundamental policy of the Government to refrain, as much as possible, from doing its own manufacturing and to use, as much as possible (in the production of munitions), the experience in mass production and the genius for organization that had made American industry outstanding in the world. The essence of this policy called for private, rather than public, operation of war production plants. . . . It would have been simple for the Government to have ordered all of this production to be done under governmental operation as well as under governmental ownership. To do so, however, might have weakened our system of free enterprise. We relied upon that system as the foundation of the general industrial supremacy upon which ultimate victory might depend. In this light, the Government deliberately sought to insure private operation of its new munitions plants.

In these great projects built for and owned by the Government, it was almost inevitable that the new equipment and materials would be supplied largely by the Government and that the products would be owned and used by the Government. It was essential that the Government supervise closely the expenditures made and the specifications and standards established by it. These incidents of the program did not, however, prevent the placing of managerial responsibility upon independent contractors.

The relationship of employee and employer between the worker and the contractor appears not only in the express terminology that has been quoted. It appears in the substantial obligation of the respondent-contractors to train their working forces, make job assignments, fix salaries, meet payrolls, comply with state workmen's compensation laws and Social Security requirements and "to do all things necessary or convenient in and about the operating and closing down of the Plant, . . . "

339 U.S. at 505–07, 70 S.Ct. at 760–61 (footnotes omitted) (emphasis in original).

Here as in *Powell*, the Government has deliberately opted for the "genius" of private enterprise in the operation of its Scranton Army Ammunition Plant. In so choosing, the Government enjoys the benefits that are derived from private operation, but by the same measure, it must also suffer any reciprocal burdens. One of those burdens is the responsibility of Chamberlain's compliance with state pollution regulations.

In sum we find no significant distinction between this case and *Powell*. Hence we are persuaded that *Powell's* reasoning applies with equal force to the Pennsylvania Board's attempts to regulate discharges of pollutants resulting from Chamberlain's operations. *Cf. United States v. Boyd*, 378 U.S. 39, 44–48, 84 S.Ct. 1518, 12 L.Ed.2d 713 (1964) (the use of Government-owned property by a federal contractor for profitable activities is a taxable activity, even if the tax is finally borne by the United States); *United States v. City of Detroit*, 355 U.S. 466, 469, 78 S.Ct. 474, 476, 2 L.Ed.2d 424 (1958) ("it is well settled that the Government's constitutional immunity does not shield private parties with whom it does business from state taxes imposed on them merely because part or all of the financial burden of the tax eventually falls on the Government"); *Penn Dairies, Inc. v. Pennsylvania Milk Control Commission*, 318 U.S. 261, 269, 63 S.Ct. 617, 620, 87 L.Ed. 748 (1943) (independent federal contractor may be regulated, taxed and subject to license revocation by state even though such tax and regulation increases burden on federal government: "those who contract to furnish supplies or render services to the

government are not [federal] agencies and do not perform governmental functions"); *Alabama v. King & Boozer,* 314 U.S. 1, 8–12, 62 S.Ct. 43, 86 L.Ed. 3 (1941) (state may levy sales tax on purchase of goods by contractor who buys them for use in performing "cost-plus" contract for the Government, even though title to materials vests in the United States upon inspection and acceptance, and even though Government reimburses contractor for tax paid). *See also United States v. Georgia Public Service Commission,* 371 U.S. 285, 83 S.Ct. 397, 9 L.Ed.2d 317 (1963); *Keifer & Keifer v. Reconstruction Finance Corp.,* 306 U.S. 381, 59 S.Ct. 516, 517, 83 L.Ed. 784 (1939) ("the government does not become the conduit of immunity in suits against its agents or instrumentalities merely because they do its work").[22]

Inasmuch as Congress has inclined toward restricting immunity from pollution control even for acknowledged federal agencies,[23] we see no reason to broaden immunity as it relates to the private sector. The recent amendments to section 313 subject any "department, agency or instrumentality of the executive, legislative, and judicial branches" to "all" state and local regulations "notwithstanding any immunity" (albeit permitting removal of proceedings to the federal courts and limiting the payment of certain penalties).[24] This amendment confirms our understanding that under the

**22.** Two recent Supreme Court decisions are also marginally relevant insofar as they rule that a waiver of sovereign immunity, and the resultant amenability of a federal agency to state regulation, will not be found absent "a clear expression or implication to that effect." *Hancock v. Train,* 426 U.S. 167, 179, 96 S.Ct. 2006, 2012, 48 L.Ed.2d 555 (1976), *superseded by statute,* Pub.L.No.95–96, tit. I, § 116, 91 Stat. 711 (1977) codified *as amended* at 42 U.S.C.A. § 7418 (Nov. 1977 Supp.)), *quoting United States v. Wittek,* 337 U.S. 346, 359, 69 S.Ct. 1108, 93 L.Ed. 1406 (1949); *accord, EPA v. California ex rel. State Water Resources Control Bd.,* 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976), *superseded by statute,* Pub. L.No.95–217, § 60, 91 Stat. 1597 (1977) (codified *as amended* at 33 U.S.C.A. § 1323(a) (Feb. 1978 Supp.)). Yet whatever their vitality, *Hancock* and *EPA* do not treat with the issue of whether or when a private company becomes converted into a federal agency by virtue of contracting with the Government. *Hancock* and *State Water Resources Control Bd.* held only that federal agencies need not procure state air and water pollution control permits. Even those holdings, as indicated, have now been effectively overruled by statute.

**23.** *See* n.1 *supra* & n.24 *infra.*

**24.** Section 313 *as amended* reads in relevant part:

Federal facilities pollution control

(a) Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants and each officer, agent, or employee thereof in the performance of his official duties, shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable services charges. The preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement, whatsoever), (B) to the exercise of any Federal, State, or local administrative authority, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner. This subsection shall apply notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law. Nothing in this section shall be construed to prevent any department, agency, or instrumentality of the Federal Government, or any officer, agent, or employee thereof in the performance of his official duties, from removing to the appropriate Federal district court any proceeding to which the department, agency, or instrumentality or officer, agent, or employee thereof is subject pursuant to this section, and any such proceeding may be removed in accordance with section 1441 et seq. of Title 28. No officer, agent, or employee of the United States shall be personally liable for any civil penalty arising from the performance of his official duties, for which he is not otherwise liable, and the United States shall be liable only for those civil penalties arising under Federal law or imposed by a State or local court to enforce an order or the process of such court. The President may exempt any effluent source of any department, agency, or instrumentality in the executive branch from compliance with any such a requirement if he determines it to be in the para-

Act even "Federal facilities [must] meet all control requirements as if they were private citizens" in order "to provide national leadership in the control of water pollution." [25] If we were to thwart this national policy as well as evident congressional intent [26] by

acceding to the Government's argument that independent contractors partake of an immunity as great as that of the Government itself, we would be denying the entire course of environmental pollution control, a fundamental concern of Congress and socie-

mount interest of the United States to do so; except that no exemption may be granted from the requirements of section 1316 or 1317 of this title. No such exemptions shall be granted due to lack of appropriation unless the President shall have specifically requested such appropriation as a part of the budgetary process and the Congress shall have failed to make available such requested appropriation. Any exemptions shall be for a period not in excess of one year, but additional exemptions may be granted for periods of not to exceed one year upon the President's making a new determination. The President shall report each January to the Congress all exemptions from the requirements of this section granted during the preceding calendar year, together with his reason for granting such exemption. In addition to any such exemption of a particular effluent source, the President may, if he determines it to be in the paramount interest of the United States to do so, issue regulations exempting from compliance with the requirements of this section any weaponry, equipment, aircraft, vessels, vehicles, or other classes or categories of property, and access to such property, which are owned or operated by the Armed Forces of the United States (including the Coast Guard) or by the National Guard of any State, and which are uniquely military in nature. The President shall reconsider the need for such regulations at three-year intervals.
Pub.L.No.95–217, § 60, 91 Stat. 1597 (1977) (codified as amended at 33 U.S.C.A. § 1323(a) (Feb. 1978 Supp.)), superseding EPA v. California ex rel. Status Water Resources Control Board, 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). Cf. Clean Water Act of 1977, Pub. L.No.95–217, 91 Stat. 1566 (codified in scattered sections of 33 U.S.C.A. ch. 26 (Feb. 1978 Supp.)); 46 U.S.L.W. 2324 (Dec. 20, 1977) (regional office of the EPA has recently issued environmental enforcement letters to seventeen major federal facilities said to be violating environmental standards, thereby instituting "the first formal action under a recently announced agency policy of enforcing the federal Clean Air and Water Pollution Control Acts against federal facilities").

25. S.Rep.No.414, 92d Cong., 1st Sess. 67, reprinted in [1972] U.S.Code Cong. & Admin. News, pp. 3733–34.

26. In its brief the Government seeks to support its argument by citing to certain fragments of

legislative history which state that § 313 was enacted to subject federal activities, carried on directly or "by contract," to state pollution control. Government's Brief at 11–12, citing H.R.Rep.No.127, 91st Cong., 1st Sess. 6, 19–20, reprinted in [1970] U.S.Code Cong. & Admin. News, pp. 2691, 2696, 2710–11, and H.R.Con. Rep.No.940, 91st Cong., 2d Sess. 55, reprinted in [1970] U.S.Code Cong. & Admin.News, pp. 2691, 2740. We find this history to be ambiguous and inconclusive.

First we believe that § 313 is clear and unambiguous as it relates to subjecting federal agencies to state and local environmental controls. As such, Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917), and Schiaffo v. Helstoski, 492 F.2d 413, 428 (3d Cir. 1974), teach us that recourse to legislative history is inappropriate. See generally 2A C. Sands, Sutherland's Statutes and Statutory Construction ¶¶ 46.01, 46.04 (4th ed. 1973); Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 527, 527–28 (1947); Murphy, Old Maxims Never Die: The "Plain-Meaning Rule" and Statutory Interpretation in the "Modern" Federal Courts, 75 Colum. L.Rev. 1299 (1975).

Second, even if we were to look to legislative history, we would not agree with the Government's construction.

The Government would interpret the language quoted above to carve out a partial immunity for the private independent contractor under § 313. We think however that this language does not address the status of the operator of a federal facility; nor does it attempt to equate a private contractor with a federal agent. Rather, we believe that its import is to acknowledge that all federal activities and operations are subject to pollution control requirements. We read this language as no more than one of the many attempts made by the legislature to broaden the scope of permissible state and local regulation, and not, incongruously, as an attempt to narrow state control by impliedly carving out immunity for independent contractors. See, e. g., S.Rep.No.414, 92d Cong., 1st Sess. 67, reprinted in [1972] U.S. Code Cong. & Admin.News, pp. 3733–34 (§ 313 "would require every Federal agency with control over any activity or real property, to provide national leadership in the control of water pollution in such operations. . . . This section requires that Federal facilities meet all control requirements as if they were private citizens").

ty. *See also E. I. du Pont de Nemours & Co. v. Train,* 430 U.S. 112, 138, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977); *American Iron & Steel Institute v. EPA,* 526 F.2d 1027 (3d Cir. 1975), *modified,* 560 F.2d 589 (3d Cir. 1977), *cert. denied,* 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978).

The order of the district court will be affirmed.[27]

JAMES HUNTER, III, Circuit Judge, dissenting:

I respectfully dissent. The majority has determined that Chamberlain Manufacturing Corporation is an independent contractor and that the Pennsylvania Environmental Hearing Board (the Board) has assessed the penalties involved in this case on Chamberlain in that capacity. The majority further reasons that since Chamberlain, as a private corporation, partakes of no special immunity from state regulation by virtue of its dealings with the federal government,

the district court did not err in refusing to enjoin the collection of the penalty and entering judgment for the Board.

I believe that the proper analysis to be applied in this case is two tiered: has the Board's action regulated activity over which the federal government has retained control; and if so, has Congress consented to this state regulation? If the Board's action constitutes unconsented-to regulation of the United States, the district court should have enjoined the Board from encroaching on the federal government's immunity from state regulation.

In my view, the relationship between the federal government and Chamberlain cannot be characterized as that of employer-independent contractor as to all aspects of Chamberlain's presence on the premises of the Scranton Army Ammunition Plant. The federal government has, to a real extent, retained control over the facility. The Board's penalty, although imposed on

27. The dissent advocates a remand so that the district court may make findings as to which functions of the plant's operations are in Chamberlain's control, and therefore are not immune from state regulation, and which functions should be attributed to the federal Government's control and are therefore presumably immune. As the text above reveals, we are satisfied beyond question that, on the record before us, Chamberlain is clearly an independent contractor and is not a "department, agency or instrumentality" of the Government. As such, Chamberlain cannot in the present context be shielded from the state proceedings.

While we recognize a certain surface attraction in the dissent's "allocation of functions" approach, there are major problems inherent in such a procedure.

First, to our knowledge the Government declined to present before the Board any proof as to which plant functions were "governmental functions". Whether such proof would have affected the amount of the penalty is not relevant to the present proceeding, for here we are faced not with an appeal from the Board's decision, but rather with an injunctive action which seeks a ruling that the Board had no jurisdiction even in a situation where private violations based upon "private functions" may have been found. Moreover even if we were to interpret the relief sought by the Government as an effort to reduce the amount of the penalty imposed by the Board because in the *Government's view* certain functions should have been characterized as governmental rather than private, it must be remembered that the

Board at no time "allocated" the penalty on a "functional basis." Indeed, as stated above, the Government failed to offer proofs in that regard. In any case, we have grave doubts whether on this record we would be empowered to grant such a remedy.

Second, sections 313 and 505 of the Act speak only to the institution of an action in federal district court where a "department, agency or instrumentality" of the Government is involved. Those sections do not provide for any "allocation of function" inquiry; nor do they provide for any type of "partial immunity." *A fortiori* they do not require a state to proceed in federal court to rectify private violations by parties such as Chamberlain.

Finally we note that even the parties did not regard as important or relevant findings allocating functions to Chamberlain or to the Government, since they submitted the case to the district court on stipulated facts.

Accordingly, the only issue before us requires our review of the district court's order of summary judgment entered on undisputed facts. That order concludes that Chamberlain was *not* a "department, agency or instrumentality" of the Government. We therefore believe that little purpose would be served by, and seriously question our ability to require a remand to the Board for a quantitative allocation of functions, particularly since the contract between Chamberlain and the Government clearly sets forth both Chamberlain's status, and its obligations to comply with state and local law.

Chamberlain, operates in part to regulate some aspects of the Scranton Plant over which the government has retained control. Finally, the Board has proceeded in a manner inconsistent with the limited authority conferred to the states by section 313 of the Federal Water Pollution Control Act 1972 Amendments[1] to regulate pollution discharges of federal facilities. Thus I would reverse the judgment of the district court.

## I.

In *Mayo v. United States,* 319 U.S. 441, 445, 63 S.Ct. 1137, 1139, 87 L.Ed. 1504 (1943) the Supreme Court stated that "the activities of the Federal Government are free from regulation by any state." Congress may subject federal instrumentalities, property, or activities to state regulation, but "an authorization of state regulation is found only when and to the extent there is 'a clear congressional mandate,' 'specific congressional action' that makes the authorization of state regulation 'clear and unambiguous.' " *Hancock v. Train,* 426 U.S. 167, 179, 96 S.Ct. 2006, 2013, 48 L.Ed.2d 555 (1976) (footnotes omitted).

Nevertheless, not all activity that "touches" the activities of the federal government is exempt from state regulation. *Id.* States are not necessarily hindered by the doctrine of intergovernmental immunities when they seek to regulate the activities of a private contractor supplying goods to or performing work for the federal government on federal property. *See Penn Dairies v. Pennsylvania Milk Control Commission,* 318 U.S. 261, 63 S.Ct. 617, 87 L.Ed. 748 (1943); *Alabama v. King & Boozer,* 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3 (1941). In those cases, contractors which supplied goods to the United States were required to submit to nondiscriminatory taxation and regulation with respect to their activities,

even though the cost of the regulation would be borne by the United States. Thus, it seems that the state may regulate the manner in which a private contractor does work for the government on federal property 1) to the extent that the contractor's activities affect valid state interests beyond the boundary of the federal facility; and 2) to the extent that federal law does not conflict with the state regulation.

Nevertheless, it is axiomatic that state regulation can only be directed at the private contractor's activities and not at those of the federal government itself. The mere fact that the United States has employed a contractor to perform services on federal property does not open the entire facility to state regulation. If the state seeks to regulate activity at the federal facility over which the United States has retained control, it can do so only if Congress has consented to the regulation. Otherwise, the federal activity is immune from state regulation. *Cf. United States v. Allegheny County,* 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944) (property of the United States supplied to contractor for use at the contractor's plant may not be taxed at full value where contractual restrictions on its use for the government's benefit render property less valuable to contractor).

## II.

In this case, the Board, in furtherance of its duty to regulate the discharge of pollutants into state waters, assessed civil penalties against Chamberlain for discharging wastes into Roaring Brook while performing its contracts on the premises of the Scranton Plant.[2] To determine whether the Board has the authority to assess fines, I believe that the court must analyze whether the state's regulation is directed at the fed-

---

1. Pub.L.No.92–500, 86 Stat. 875 (1972) (repealed 1977) (codified at 33 U.S.C. § 1323 (Supp. IV 1974), *reprinted in* majority opinion, *supra,* note 1. Although since repealed, section 313 of the 1972 Act applied at the time relevant to this appeal.

2. The fact that the penalty assessed by the Board is directed only at Chamberlain is not

determinative of this case. If the state pollution requirements applied to matters over which the federal government, and not Chamberlain, retained control, the Board could not compel compliance with its regulations by imposing the penalties only on Chamberlain. *See United States v. Allegheny County, supra,* 322 U.S. at 186–188, 64 S.Ct. 908.

eral government. This can be determined by first examining the scope of authority delegated to Chamberlain in its contract in order to determine the extent to which the federal government has retained control over the Scranton Plant. Secondly, the extent to which the state Board has regulated activities over which the United States has retained control can be determined by examining the nature of the Board's adjudication.

### A.

The Scranton Army Ammunition Plant is a federal facility. The property on which the plant is located is owned by the United States. The equipment and installations on the property are owned by the government. The United States has engaged Chamberlain to operate the Scranton Plant, and during the time period relevant in this case, Chamberlain manufactured artillery shells for the Department of the Army.

Chamberlain's presence at the Scranton Plant from July 31, 1970 through December 18, 1972 (the period of time for which fines were assessed), was by virtue of two "facilities" contracts entered into with the government. The first contract, executed in 1963, contained no mention of Chamberlain's authority to bring the plant into compliance with pollution control requirements. As noted by the majority, Chamberlain was required to procure all "necessary permits and licenses" and to obey all "other rules of the United States of America, of the state, territory, or subdivision thereof" where the work described by the contract was to be performed.

The stipulated facts presented to the district court, however, indicate that Chamberlain was unable to provide and be reimbursed for pollution control facilities for the plant without government approval.[3] Further, the facts indicate that while pollution abatement projects were commenced at the

plant as early as 1966, the Department of the Army was intimately involved with the preparation, budgeting, and budget apportionment of such projects. The parties also agreed that the pollution control project covered a period of four years, and that even an emergency contract submitted to the Department of the Army required more than a year for work to commence.[4]

The contract itself indicates the extent to which the United States, through the Department of the Army, retained control over the facility. Chamberlain's activities on the government property were subject to certain supervision by the Army contracting officer, Lieutenant Colonel Duggan, on the premises. The contract provided that Chamberlain was required to provide, by manufacture or by purchase, the Scranton Plant with certain equipment. Further, the government was to provide equipment and facilities to the contractor, for use by the contractor in fulfilling its commitment to supply the government with artillery shells. Beyond the equipment described in the contract, the contracting officer was empowered to add other materials to be supplied for the plant. Chamberlain was entitled to suggest additions or changes but was required to continue to perform its obligations under the facilities contract even when the changes it recommended had not yet been adopted.

The contract required Chamberlain to establish and implement a program for the proper protection, maintenance, preservation, and repair of the facility. The program was required to be approved by the contracting officer, and no replacement, repair, or restoration of the plant or facilities beyond that approved by the contracting officer could be performed unless Chamberlain was directed to do so.

The second contract between Chamberlain and the Army was executed on July 1, 1971. The agreement contained specific

---

3. Finding of Fact 43, 431 F.Supp. 747, 751 (M.D.Pa.1977).

4. Finding of Fact 44, 431 F.Supp. at 751.

provisions relating to pollution abatement. The first paragraph of Article IV–D of the contract provides:

The parties recognize that the plant, as presently equipped, its location and its age may be incapable of conforming to the standards for environmental and pollution control currently being promulgated. As a consequence, the contractor's responsibility and liability to all Government agencies, federal, state and local, and its capability to meet imposed standards of environmental controls, must and is contingent upon availability of funds under this contract necessary to assure compliance by the facility with such standards.

In order to update facilities to meet environmental requirements, it appears that the contracting officer would be required to include in the contract schedules any pollution control equipment or replacement equipment that would conform to pollution abatement requirements after the contract had been executed. Under the provision of the contract providing for changes in the schedules, authority to add additional equipment to be installed and maintained by the contractor was vested only in the contracting officer. Further, the contract did not permit Chamberlain to put in "any fixed improvements" to the facility without approval of the contracting officer.

Also, the contract provided that if Chamberlain were subjected to any state regulation, the government would indemnify the contractor and hold it harmless for all losses incurred.

The contract provisions thus indicate that Chamberlain possessed no authority with respect to the addition of equipment or other installations at the Scranton Plant. Rather, I would find the Department of the Army retained control over the decisions as to whether or not to acquire additional equipment or make improvements to the facility, including those related to pollution abatement. Consequently, the nature of Chamberlain's relationship with the government, at least as to this aspect of the contract, was not that of an independent contractor.

The contract language referring to Chamberlain as an "independent contractor" is not inconsistent with a finding that Chamberlain lacked authority to acquire pollution control equipment and facilities. As the majority points out, Chamberlain was designated as an independent contractor as to that function it engaged to perform for the government—day-to-day operation and maintenance of the Scranton Plant. A finding that Chamberlain lacked authority to formulate and implement plans with respect to capital improvement of the facility does not conflict with the finding that Chamberlain was an independent contractor and thus not subject to federal control as to other aspects of its contract with the Army.

B.

The state's power to regulate Chamberlain necessarily must be limited to those aspects of the operation of the Scranton Plant over which the private contractor retained exclusive control. Any regulation by the Board of the Plant's activities beyond those as to which Chamberlain could be designated as having less than complete control would be directed against the federal facility itself and the federal government.

The Board imposed penalties on Chamberlain for three different violations of its Clean Streams Laws. First, Chamberlain was penalized for operating the plant and thus discharging pollutants into Roaring Brook without a permit. Second, Chamberlain was fined for discharging more oily and metallic wastes into the stream than permissible under state regulations. Third, the Board fined Chamberlain for failing to notify the State Department of Environmental Resources that it introduced toxic substances into Roaring Brook which resulted in pollution of the stream.

The district court did not examine the scope of Chamberlain's authority under its contracts or the nature of the state regulation. Although the record is not clear, an examination of the violations cited by the Board indicates that in part at least the penalties assessed against Chamberlain were directed at that aspect of the Scranton Plant's operation over which Chamberlain had no control. Thus, to some degree, the regulation necessarily was directed at the federal government, which retained all control over the facility not relegated to the contractor.

*The permit requirement.* In order to qualify for a permit under the Pennsylvania laws applicable to this case, it appears that any ongoing industrial operation must have first demonstrated that the waste it would discharge had been detoxified to a degree acceptable to state authorities. See 35 Pa. Stat.Ann. § 691.307 (Purdon 1970). Without such a permit, the facility is prohibited from operating. Thus, if the imposition of the permit requirement would compel the federal government to take any action to bring the Scranton Plant into compliance with state discharge limits, the requirement operates to regulate the federal facility directly. *See Hancock v. Train, supra,* 426 U.S. at 180, 96 S.Ct. 2006.

*Discharges of oil and metallic wastes.* An industrial operation may, under the Pennsylvania regulations, 25 Pa.Code, ch. 95 §§ 95.3, 97.14, 97.63 & 101.3, be subject to penalties for discharging wastes containing excess amounts of oil or metallic matter. If the federal government, by virtue of its retention of control over the acquisition of equipment and installation for the Scranton Plant, would be forced to institute improvements to the facility itself in order to comply with the regulations, the United States, and not Chamberlain, is the direct object of the Board's action.

To an extent, however, the record indicates that the Board's penalties may have been directed at Chamberlain's conduct in performing its contract, and not at those aspects of the Scranton Plant over which the federal government retained control. The record discloses a factual dispute as to the extent to which some part of the discharges occurred because of Chamberlain's failure to exercise care in its day-to-day operation and maintenance of the plant. State regulation which has the sole effect of requiring a private contractor to minimize pollution discharges caused by the contractor's performance of duties over which the federal government does not retain the right to control would not operate as regulation of the federal government. I believe that the district court should be required to resolve the factual questions raised here.

*The notice requirement.* Although the record in this case does not indicate the nature of this violation cited by the Board, I believe that the district court should ascertain whether the state regulation intended by the notice requirement applied to those aspects of the operation of the Scranton Plant over which the federal government retained control or merely to Chamberlain's own duties as an independent contractor on the site. Again, to the extent that the state regulation is directed at the United States, the action of the Board infringes on the federal government and cannot be enforced unless Congress has consented to the regulation.

### III.

The state regulation involved in this case is directed at least in part at the federal government. In order to determine whether the Board had the authority to proceed in this manner, the scope of congressional consent to state regulation of federal facilities, outlined in the Federal Water Pollution Control Act 1972 Amendments, *supra,* must be examined.

As the majority has noted, the government has argued that under section 313 of the Federal Water Pollution Control Act 1972 Amendments, the State Board was without authority to regulate the govern-

ment's discharge of pollutants from a federal facility by bringing an enforcement action in a state administrative proceeding. The cases relied on by the government, *Hancock v. Train, supra,* and *EPA v. California ex rel. State Water Resources Control Board,* 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976), indicate that at the time that the Pennsylvania Environmental Control Board imposed penalties on Chamberlain, Congress had consented to state regulation of federal facilities in only a limited fashion.[5]

Section 313 of the Act requires every department, agency, or instrumentality of the federal government with jurisdiction over any property or engaged in any activity which could result in the discharge of pollutants to comply with federal, state, and local requirements respecting control and abatements of water pollutants. The case law interpreting section 313 indicates, however, that Congress provided for limited jurisdiction for enforcement by the states or private persons. The only means provided for enforcing a state's requirements respecting water pollution control is provided by section 505 of the Act, 33 U.S.C. § 1365 (Supp. IV 1974), which permits any person (including a state) to bring an action in *federal court* for violation of an effluent standard or limitation under the Federal Water Pollution Control Act.

The legislative history of the Act makes clear that federal facilities operated by nongovernmental entities are subject to the requirements of section 313 of the Act. H.R.Rep.No.127, 91st Cong., 2d Sess. 6, 19–20, *reprinted in* [1970] U.S.Code Cong. & Admin.News, pp. 2696, 2710–11; H.Conf. Rep.No.940, 91st Cong., 2d Sess. 55, *reprinted in* [1970] U.S.Code Cong. & Admin.News, p. 2740. Thus, to the extent that a state seeks to regulate the federal government's activities that cause pollution in the state, it must proceed pursuant to section 505 against the government in federal court. To the extent that the Board's adjudication in this case must be regarded as regulating the federal government, the Board was without jurisdiction to enter its order.

The majority implies that reversal of the district court in this case would thwart the national policy of fighting the dangers caused by water pollution at all levels of society. I believe that the scope of this case is far more limited. Since the Board did not avail itself of the means by which the Scranton Plant could have been brought into compliance with water pollution requirements, its actions operated as an attempt to regulate the federal government in a manner inconsistent with its consent.[6] I would reverse and remand this case to the district court for further proceedings.

---

5. As the majority has noted, the 1977 Amendments to the Act broaden the scope of the congressional consent to state regulation of federal facilities in this regard. *See* majority opinion, *supra,* notes 23–24 and accompanying text.

6. I do not believe that footnote 27 of the majority reaches the position taken in this dissent.