

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-2-1999

# Anjelino v New York Times

Precedential or Non-Precedential:

Docket 98-6024

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Anjelino v New York Times" (1999). *1999 Decisions.* Paper 315.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/315

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 2, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-6024

KAY ANJELINO; ISRAEL CABASSA; ALICIA CARRANZA;
JOANN COANGELO; KATHLEEN DEANGELO; MARGARET
DEANGELO; EDDIE HUMPHREY; SHEILA KELLY; MARK
S. KORNBLUM; ROBERT LAURA; STEPHEN W. MAGGIO;
HILARY MENDELSON; BIRGITTA MENDOLA; LOIS MOSS;
NOREEN MOSS; ARTHUR O'CONNELL; MILAGROS
PEREIRA; RUTH RICHARDSON; NANCY J. SIMATOS;
ELLEN V. SIMS; ANASTASIOS SPARTOS;
DANIEL STRINGER; LILLIAN SULLIVAN; ROSA M.
TORRES; ANNA MARIE TRAUSE

v.

THE NEW YORK TIMES COMPANY; ARTHUR OCHS
SULZBERGER, JR.; NEW YORK MAILERS' UNION NO. 6;
GEORGE MCDONALD; ITU NEGOTIATED PENSION PLAN
(D.C. Civil No. 92-cv-02582)

KAY ANJELINO; ISRAEL CABASSA; ALICIA CARRANZA;
JIMMY CARROLL; JOANN COANGELO; MAUREEN
CONROY; MAUREEN DOLPHIN; KATHLEEN DEANGELO;
MARGARET DEANGELO; JACKIE FOGARTY; EDDIE
HUMPHREY; JANET KHOE; SHEILA KELLY; DENNIS
KNAPP; MARK S. KORNBLUM; ROBERT LAURA;
STEPHEN W. MAGGIO; HILARY MENDELSON; BIRGITTA
MENDOLA; LOIS MOSS; NOREEN MOSS; ARTHUR
O'CONNELL; MILAGROS PEREIRA; RONALD PLAKIS;
RUTH RICHARDSON; NANCY J. SIMATOS; ELLEN V.
SIMS; ANASTASIOS SPARTOS; DANIEL SPRINGER;
LILLIAN SULLIVAN; ROSA M. TORRES;
ANNA MARIE TRAUSE

v.

THE NEW YORK TIMES COMPANY; ARTHUR OCHS
SULZBERGER, JR.; NEW YORK MAILERS' UNION NO. 6;
GEORGE MCDONALD; ITU NEGOTIATED PENSION PLAN
(D.C. Civil No. 93-cv-02870)

       Kay Anjelino, Israel Cabassa, Alicia Carranza,
       Joann CoAngelo, Kathleen DeAngelo, Margaret
       DeAngelo, Eddie Humphrey, Sheila Kelly, Mark
       S. Kornblum, Robert Laura, Stephen W.
       Maggio, Hilary Mendelson, Birgitta Mendola,
       Lois Moss, Noreen Moss, Arthur O'Connell,
       Milagros Pereira, Ruth Richardson, Nancy J.
       Simatos, Ellen V. Sims, Anastasios Spartos,
       Daniel Stringer, Lillian Sullivan, Rosa M.
       Torres and Anna Marie Trause,
       Appellants

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action Nos. 92-cv-02582/93-cv-02870)
District Judge: Honorable William H. Walls

Argued November 5, 1998

Before: SCIRICA and ROTH, Circuit Judges, and
SCHWARTZ,1 District Judge

(Filed December 2, 1999)

_____

1. Honorable Murray M. Schwartz, United States District Court Judge for
the District of Delaware, sitting by designation.

2

Josee G. Charvet, Esquire (Argued)
Shneyer & Shen, P.C.
1085 Teaneck Road
Teaneck, New Jersey 07666

Michael Shen, Esquire
Shneyer & Shen, P.C.
2109 Broadway, Suite 206
New York, NY 10023

Attorneys for Appellants

Paul Salvatore, Esquire (Argued)
Loren Gesinsky, Esquire
Ravi Motwani, Esquire
Proskauer Rose LLP
1585 Broadway
New York, NY 10036-8299

Attorneys for Appellees
The New York Times Company
and Arthur Ochs Sulzberger, Jr.

Paul L. Kleinbaum, Esquire
Zazzali, Zazzali, Fagella & Nowak
One Riverfront Plaza
Newark, NJ 07102

Richard Rosenblatt, Esquire (Argued)
Boyle, Tyburski & Rosenblatt
8085 East Prentice Avenue
Englewood, CO 80111

Attorneys for Appellees
New York Mailers' Union No. 6
and George McDonald

OPINION OF THE COURT

ROTH, Circuit Judge:

The appellants, a group of former mail room employees of the New York Times Company (the "Times") brought an employment discrimination action against the Times; its publisher, Arthur O. Sulzberger, Jr.; New York Mailers'

3

Union No. 6; and George McDonald, the president of the Union. The appellants were members of the Union while employed by the Times. All the appellants, female and male, Hispanic and non-Hispanic, alleged discrimination by the Times on the basis of sex. In particular, they alleged sex-based discrimination with respect to compensation and assignment of work and also retaliation; the female appellants also alleged sexual harassment. In addition, the Hispanic appellants alleged discrimination and harassment because of race, color, and national origin.[2]

In response to the Times' pre-trial motions, the District Court dismissed the Amended Complaint in its entirety. The court reached the merits of the claims in only a few instances. Most counts were dismissed for lack of subject matter jurisdiction due to the appellants' failure to exhaust administrative remedies or to their lateness infiling charges. The male appellants' sex discrimination claims were dismissed for lack of standing to sue under Title VII and NJLAD. The District Court granted summary judgment for appellees on the remaining counts.

We conclude that the Amended Complaint should not have been dismissed in its entirety. With respect to the first issue before us, the standing of the male appellants to sue for sex discrimination, we will reverse. We do so based on our determination that "indirect" victims of discrimination have standing to sue under Title VII if they allege a claim of injury-in-fact that is redressable at law. As to most of appellants' other claims of sex and race discrimination and retaliation, we find either that the District Court applied an incorrect legal standard in finding that it lacked jurisdiction or that it misinterpreted the significance of certain evidence in the record that we find probative of discrimination. We will reverse the dismissal of these claims. We will, however, affirm the dismissal of the claims of sex discrimination and sex-based retaliation under section 1981 because section

_____

2. The appellants in this action include nineteen females and nine males; four are Hispanic. App. at 347. The Hispanic appellants' allegations of discrimination on the basis of race, color, or national origin will be referred to as "race discrimination," except where our analysis requires a distinction to be drawn among these categories.

4

1981 does not reach these forms of discrimination. We also will affirm the dismissal of the Labor Management Relations Act of 1947 ("LMRA") and the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA") claims against the Union and the Times because the appellants failed to exhaust the Union's internal grievance procedures. In addition, we will affirm the dismissal of the discrimination and retaliation claims brought against the Union because the Union was not the appellants' employer and the appellants failed to exhaust the Union's grievance procedures. Finally, we will affirm the District Court's decision to deny the appellants' further discovery, but we will reverse the sanctioning of appellants' counsel for requesting reconsideration of the discovery decision.

I. Factual Background

The genesis of this case is a controversy between the New York Times and its union shop, on the one hand, and female and Hispanic workers on the other. Before the late 1970s, the Times' mail room employees had been almost exclusively non-minority male. Even at present, women constitute only a fraction of the Times' mailers. Indeed, the Union and the Times do not dispute the appellants' claim that the Union admitted them reluctantly, under order of a review board.

This dispute is a part of a lengthy history of competition among laborers for jobs in the New York metropolitan area newspaper industry. In particular, there has been a long-standing disagreement between labor and management concerning the use of substitute workers to assemble the newspapers. The success or failure of collective bargaining efforts to resolve this conflict is central to the allegations in this action. During the relevant period, the Union represented mail room employees at the Times, the New York Daily News, and the New York Post.

A. Terms of the Collective Bargaining Agreement and the Baar Award

In 1959, after a series of disputes between management and labor, an arbitration board, the Baar Commission, developed new practices for hiring and promotion of mailers

at various New York City newspapers. These practices were set forth in the "Baar Award." The Baar Award was designed to ensure the orderly hiring of extra workers when there was not sufficient regular staff to perform necessary daily tasks.

In 1984, under the terms of the collective bargaining agreement (the "CBA") and the Baar Award, 3 the Times and the Union, along with other area publishers, agreed to a mail room staffing scheme. Under this plan, the mail room was to be staffed by two groups of workers: "situation holders," who were scheduled to work five shifts per week, and "extras," who were substitute workers. Extras were hired according to seniority at daily "shapes." Management determined extras' seniority on the basis of an annual review of their work records. This review was conducted each year on February 15. Seniority was determined by evaluating the mailer's position on the publisher's "priority list." The priority list divided mailers into five categories, "A" through "E." When first hired, extras were placed into category "E." Extras might advance from category "E" to "D" on the priority list by working at least fifteen shifts per quarter of each year. Although extras might work shifts for any publisher who was a party to the CBA, extras would not appear simultaneously on more than one employer's hiring list. Moreover, continuous employment with a single publisher increased the likelihood of advancement on the priority list. Extras, who transferred from one publisher to another, received credit for shifts worked for the prior employer during the year; transfers were, however, placed at the bottom of the appropriate priority list category of the new employer. In this way, extras who expressed interest and were successful in obtaining employment at daily shapes -- preferably continuous and regular employment with a single publisher -- could advance along the priority list from category "E" to categories "D" and "A-B."4

_____

3. This CBA became effective on March 31, 1984, and, as a result of a series of modifications and extensions, runs through March 30, 2000.

4. The Baar Award also provided for a "C" list. Mailers on the "C" list were not hired according to seniority, however, but "according to the needs of the office."

If the annual review of an extra's work record showed that he or she had worked at least 180 shifts during the preceding year,[5] the individual would be placed into category "A" or "B" on the priority list. If, however, an extra failed to meet the requirements for advancement to "A" or "B" for two out of three successive years, that individual was demoted, or "delisted." Delisted mailers could reapply to work as mailers for publishers that were signatories to the CBA. Their status on a publisher's list would not, however, reflect credit for shifts worked prior to delistment. A four-person board, comprised of two representatives each from the Times and the Union, reviewed complaints arising from the delistment or transfer of extras. If this review board could not agree on the propriety of an extra's delistment or transfer, the complaint was referred to an arbitrator for resolution.

B. The Appellants' Claims of Sex and Race Discrimination

The appellants have been employed in the Times' mail room as extras. As such, they were subject to the terms of the CBA and the Baar Award. During the mid-1980s, the appellants were placed on the "D" priority list. Although the priority list system allegedly is a facially neutral process for assigning work to mail room employees, the Amended Complaint alleges that, during their employment at the Times, the appellants experienced sex- and race-based discrimination on a daily basis, which greatly limited their ability to advance on the list. The alleged discrimination occurred with respect to compensation, terms, and other conditions of employment; it included sexual and racial harassment and retaliation for the filing of the instant lawsuit and charges before the EEOC. The allegations of the Amended Complaint, recounted in the light most favorable to the appellants, are outlined below.

1. Compensation/Assignment of Work

During their employment by the Times, appellants allege that sex- and race-based discrimination repeatedly limited or impeded their ability to advance on the priority list and, thus, to obtain work and earn wages at rates comparable to

_____

5. The requirement was 160 shifts prior to 1962.

those of males and/or non-Hispanic white workers. During the period from the mid-1980s through and beyond August of 1992, the appellants claim to have experienced discrimination in compensation and work assignment prospects. They allege that policies regarding seniority and hiring from the priority list repeatedly were manipulated in ways that limited the employment opportunities of female and Hispanic workers. They claim, for instance, that hiring for work shifts commonly stopped just before the names of women on the priority list were reached. The exclusion of women from employment caused them to lose hundreds of hours of work and wages and also to lose seniority. In addition, if hiring was stopped at the point where females showed up on the list, males who were listed among those females would not be hired.

In other instances, appellants claim, the seniority system and Baar Award were violated altogether. On these occasions, men, who had less seniority on the priority list, were hired for work shifts instead of more experienced women. Appellants claim that this type of "leap-frogging" occurred repeatedly over time, including on the following dates: August of 1986, when approximately 275 Daily News mailers, the vast majority of whom were male, were placed ahead of female mailers on the Times' priority list; 6 March through June of 1998, when fifteen Post workers were placed ahead of female mailers on the Times' priority list; and October of 1990, when sixteen Daily News situation holders who were on strike from their paper were placed ahead of Times' mailers, including the appellants, causing the appellants to be unemployed for three weeks. Appellants contend that on these occasions and at other times men, who had or should have had less seniority than women on the list, were hired as substitute workers.

Appellants also claim that, in numerous other ways, women were made to work under conditions that were different from and less favorable than the terms and conditions under which men, in particular non-Hispanic

_____

6. Appellants allege that many of the Daily News workers were allowed to maintain their position on the Daily News' priority list, in violation of the
Baar Award. See, however, Part I.C for the Times' response to this claim.

8

men, worked. Appellants charge that the Times discriminated against them when assigning jobs. Appellants claim that women more often worked in unpleasant parts of the work place and performed the least desirable work. For example, rather than working on the presses or insert machines, women often worked in the hand insert section, or the "rock pile," an assignment that required constant standing, disposal of waste, and restricted movement. Women also routinely were assigned to perform objectionable tasks such as serving coffee to management and other personnel; men, including men with less seniority than women, were not asked to perform such chores. Women frequently were assigned to perform tasks that required them to work under close scrutiny of supervisors, while men were assigned jobs that allowed more autonomy.

Appellants further charge that they were discriminated against in their benefits and compensation. Appellants also allege that women were required to clean up at the end of their shifts, whereas most men were not, and that women were consistently treated differently and worse than male employees with respect to work breaks. Women's bathroom breaks were counted as their coffee breaks, while men were permitted to take both coffee and bathroom breaks. Women were required to complete an entire work shift in order to be paid for the full shift, whereas men were paid for working the full shift even though they did not complete it. Women were not given "bonus" jobs, as were male workers. Regular situation holders frequently were hired for overtime shifts when extras were available for work, thereby allegedly decreasing work opportunities for female mail room workers. Appellants also claim that only women were required to work mandatory overtime when hired, sometimes five shifts in a row, so that they became exhausted and were discouraged from seeking work. Also they assert that women were denied medical and other benefits.

Finally, the appellants make specific allegations concerning the Union. They claim that the matriculation of women into the Union was improperly delayed for arbitrary and discriminatory reasons. Even after they were

9

matriculated, the appellants allege that the leadership of the Union denied them the right to speak at Union meetings and otherwise to participate fully in the Union on the same terms as other members. In addition, the appellants contend that Union leaders ignored their complaints of harassment and discrimination, including complaints that the terms of the Baar Award often were violated or manipulated in a manner that diminished their employment opportunities.

2. Sexual and Racial Harassment

In their EEOC charges and the addenda thereto, the appellants claimed that they had been subjected to"an abusive atmosphere" because of sex.8  In the original and amended complaints, under a heading entitled "hostile work environment," the appellants alleged that crude language and behavior were directed at the female appellants by male co-workers. Appellants further stated that if they complained about such treatment, they were confronted with "ridicule" or "hostility." In addition, they alleged that a hostile work environment was created by "photographs of nude women and pornographic magazines [which] were displayed and directed at women."9

The allegations regarding sexual harassment were described most explicitly in depositions and affidavits that appellants proffered in response to appellees' motions to dismiss their claims and/or for summary judgment. In these documents, appellants claimed that their workplace was an environment in which sexually harassing language and acts routinely were inflicted upon appellants by male employees of the Times and/or Union members. Appellants claimed that neither supervisory personnel at the Times nor Union officials proscribed such harassment, punished its perpetrators, or otherwise discouraged it. In particular, appellants alleged that the Times and the Union were aware of and allowed male employees to engage in the following conduct: the display of pictures of nude or lingerie-clad women throughout the work place, but especially in female

_____

8. See, e.g., App. at 162.

9. App. at 350.

10

workers' line of vision; the throwing and display of pictures of naked men near the door of the women's restroom, again, directly within women's line of vision; the verbal harassment of female workers; the "mooning" of female workers; and the hiring of a female stripper, who performed in the workplace during work hours, removing all of her clothing, with the exception of her "G string."[10]

With respect to the alleged verbal harassment, male employees of the Times and/or Union members yelled at and otherwise subjected women to demeaning or threatening language. Appellant Ellen V. Sims alleged that she repeatedly was told, "a woman's place is in the kitchen" and that she was asked, "[W]hat are you doing here[?] [D]on't you got a home to go to[?]" When in 1993 two female appellants asked a foreman if they could use the restroom, they allegedly were told to "piss under the machine." During the Christmas season in 1991, Times' foreman Upton allegedly stated to appellants Nancy J. Simatos, Hilary Mendelson, and Lillian Sullivan, "If you want to be here to do a man's work, then work like a man . . .." One female appellant who needed assistance with her work from a male worker was told repeatedly to "get Jesus to help her," rather than him. Other male employees are alleged to have made the following remarks to various appellants: "[Management] never should have let women work here [the mailroom]"; "we don't want women here"; "they should never let women in the workplace--their place is in the kitchen"; "run without them [women] and you'll have no problems on the machine"; "if you want a man's pay, you'll have to do a man's work"; and "why don't you get out of our shop". Male employees also allegedly referred to women as the "bottom of the barrel."[11]

Moreover, appellants claim that male employees of the Times and/or Union members frequently made offensive comments about women's anatomy. Foreman Larry Levinson allegedly made comments to appellant Sims "about the size of women's breasts" and "women's

_____

10. See, e.g., App. at 1688, 1691, 1736–40, 1756, 1795–96, 2115–16.

11. See, e.g., App. at 1735, 1755, 1829, 1835, 1837, 1839–40, 2104–06, 2187–88, 2206, 2262–63, 2318, 2360–65.

11

buttocks." Another employee yelled to an appellant who had been asked her priority number during a hiring session, "Is that your number or your bust size?" Appellant Anna Marie Trause's breasts were called "bouncy," and her mail coworkers nicknamed her "Bouncy." Again, referring to Trause's breasts, supervisor Ackerman would "turn around to the guys" and comment "moo, moo ... do you want some milk?" Ackerman repeatedly made this taunt concerning Trause's breasts over the course of the work day, with other male workers responding with laughter. Supervisor Zimmerman allegedly told Trause and other women to "go back to your hands and knees, that's where you belong to begin with." Appellant Anjelino was told that she "looked like a man."12

In addition to these comments and to the discriminatory assignment of work, the Hispanic appellants claim that they were subjected to racially harassing statements. These statements included being told on several occasions, "Go back to Puerto Rico if you can't run the machine." On numerous occasions, the Hispanic appellants allegedly were told: "[S]peak English, no Spanish. ... We're in America," or "Habla Ingles?" Moreover, they claim to have been constantly taunted with comments like, "You guys make good rice and beans, right?"12

As a result of such verbal and sexual harassment, the appellants were often emotionally distraught at work, many times, to the point of tears.13

3. Retaliation

The appellants assert that this conduct increased after they complained about their mistreatment. For example, in a letter to appellee Sulzberger, dated January 30, 1992, appellants' counsel set out the basis for this suit. Shortly thereafter, a copy of the letter was allegedly posted on two employee bulletin boards, with derogatory phrases written across the letter such as: "Dykes unite," "Eat Shit," "Ass

_____

12. See, e.g., App. at 1571, 1798–1800, 2104–05, 2314, 2329–31, 2358–59.

12. See App. at 1861–66, 1999–2022, 2235, 2256–58.

13. See, e.g., App. at 1696, 1798–1801, 1835, 1866, 1868, 1863, 2368.

Holes," "Burger King is hiring," "Scabs," and "Anti-Union."
One of the bulletin boards on which the defaced letter was
placed was enclosed in glass and locked; only Times'
supervisors had keys to it.[14]

The retaliation became harsher after the administrative
complaints and the suit were filed in May and June of
1992. For example, on June 25, 1992, just after suit was
filed, the president of the Union allegedly read off the list of
plaintiffs' names at a union meeting. Another Union official,
Tommy Murphy, allegedly told some of the female
appellants, "If you think you're being discriminated against
now, wait until we get through with you." Moreover,
appellants claim that appellees accelerated the practice of
allowing men, who had not met the requirements for
progressing on the priority list, to leap-frog over the
appellants. Finally, in August of 1992, all but one of the
appellants were delisted from the priority list although
other mailers who had not complied with the terms of the
Baar Award were not. Appellants assert that the delistment
was improper under the terms of the Baar Award. However,
rather than helping the appellants, the Union delayed their
appeal of the delistments.

Even after the delistment of the appellants, the Times
and the Union allegedly continued to retaliate against them
for complaining about their mistreatment. Although many
jobs were open, the Times usually hired new personnel,
including non-Union workers, rather than the delisted
appellants. When appellants were finally rehired, they were
assigned to the worst available jobs. Co-workers continued
to harass them verbally; some appellants also claim to have
been physically threatened by co-workers. When appellants
complained repeatedly about this mistreatment, the Union
failed to address or to ameliorate it.[15]

C. The Appellees' Rebuttal

In response to the appellants' allegations, the Times
argues that at all relevant times it complied with the Baar

---

14. See App. at 1110-11, 1114, 1126, 1142-43.

15. App. at 1764-78, 1790-93, 1803-08, 2097-2101, 2111-12, 2345,
2350-55.

13

Award's policies on delistment. The Times asserts, for instance, that the appellants' claims that extras were not hired according to seniority is wrong, that "most plaintiffs freely admitted" as much, and that the appellants' "generally conceded" that the least desirable jobs were assigned to those with the least priority. The Times also claims that the appellants' complaint regarding the "leap-frogging" of 275 Daily News and Post workers over them in 1987 was settled on appeal by an arbitrator, who ruled against the appellants.[16] Moreover, the Times and Union argue that contrary to the appellants' contentions, all extras who failed to meet the Baar Award criteria for remaining on the Times' priority list were delisted in 1989, 1991, and August 1992. Therefore, they claim, the delistment of the appellants was not a result of discrimination, but rather, of their failure to meet neutral criteria for continued employment as extras. The Union also submits that five of the delisted appellants were reinstated after their claims were reviewed by the arbitrator.

Moreover, the Times claims that, even if true, the appellants' allegations that they were subjected to discriminatory treatment with respect to "taking of breaks, using the restrooms, getting coffee for other employees" and other situations "amounted to no more than slight annoyances" based on the appellants' "subjective beliefs." The Times and the Union argue that the appellants never complained about these incidents, either to the Times management or through the Union's grievance procedures.

The Times disputes the appellants' claims that "inappropriate pictures of undressed or partially undressed women" were posted in the workplace. In addition, the Times notes that none of the appellants allege that such pictures were posted after mail room operations moved to a new plant. The Times argues that, due to the date of the move, these claims are untimely. In addition, the Times notes that the appellants never complained about these postings, either to the Times management or through the Union's grievance procedures.

_____

16. Citing Anjelino v. New York Times, 1993 WL 170209 at *5-6 (D.N.J. May 14, 1993).

14

Regarding the sexually and racially harassing language, the Times contends that these claims are not sufficiently specific because the appellants are not "able to attach a date to them." In addition, the Times claims that "only coworkers" made the comments. Finally, the Times notes that the appellants never complained about these comments, either to the Times management or through the Union's grievance procedures.

The Times and the Union respond to the allegations that the Union violated the LMRA and LMRDA with the argument that they complied with the Baar Award, a claim which "none of the plaintiffs . . . disputes." At the same time, the Times asserts that "the few plaintiffs who attempted to give any examples of alleged breaches of the [CBA] or the Union's duty of fair representation related nothing but subjective beliefs and/or incidents that were time-barred." Moreover, appellants did not file the appropriate grievances with the Union.

II. Procedural History

A. EEOC Charges and The Complaint

Between May 21 and July 30, 1992, the appellants filed charges of sex and/or race, color, and national origin discrimination and retaliation with the EEOC and the New Jersey Division of Civil Rights ("NJDCR").

The charges of the female appellants alleged that 1) they were "subjected to terms and conditions of employment less favorable than that accorded of [sic] male mailers, including but not limited to being denied equal numbers of work shifts"; 2) that they "complained about the discriminatory treatment accorded them"; 3) that "[s]uch discriminatory terms and conditions of employment was [sic] even more intensified and continued throughout [their] tenure"; 4) that they were "discriminated against with respect to wages, benefits, abusive atmosphere and other terms and conditions of employment, because of sex and retaliation"; and 5) that "[t]he discrimination ... is a part of a pattern and practice of sex discrimination" that "resulted from a

15

continuing and intentional policy of sex discrimination by respondents, which predates 1980."[17]

The charges of the male appellants included all the allegations made by female appellants, with the exception of the first one. In addition, the male appellants alleged that the men were "discriminatorily treated because [their] priority number[s] on the workplace seniority list [were] in between the priority numbers of the women mailers. Such discrimination was based on sex."[18]

The charges of the Hispanic appellants included all the allegations made by female appellants (with the exception of the one Hispanic male appellant, whose charges included the allegations made by the male appellants). In addition, the Hispanic appellants alleged that they were accorded less favorable terms and conditions of employment than that accorded "White . . . mailers" and that the pattern of discrimination to which they were subjected also was based on "race, national origin and color discrimination by Respondents, which predates 1980."[19]

On September 17, 1992, appellants' counsel wrote to the EEOC, requesting "right to sue" letters because he had been informed by the EEOC that it could not complete its investigation within 180 days. Each appellant received a "notice of right to sue," dated October 5, 1992.

This action was filed in federal District Court on June 25, 1992. On August 24, appellants' counsel faxed a copy of the complaint to the EEOC. On September 17, twenty two of the appellants filed new charges with the EEOC. In the second group of charges, the appellants alleged retaliation by appellees as a result of their filing of the initial charges and the instant lawsuit. The EEOC apparently did not issue right to sue letters regarding the allegations of retaliation.

B. The Amended Complaint

The complaint was amended on October 9, 1992, to allege eight counts of sex, race, color, and national origin

_____

17. See, e.g., App. at 162.

18. See, e.g., App. at 174.

19. See, e.g., App. at 192, 451.

16

discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S 2000(e); 42 U.S.C. S 1981; and the NJLAD; violation of 29 U.S.C. S 411 et seq.; and violation of 29 U.S.C. S 185(a). The Amended Complaint also alleged continuing violations and retaliation, based on the appellants' delistment in August of 1992 and other adverse employment consequences as a result of their filing of the initial EEOC charges and the original complaint in this action.[20]

C. Disposition of The Claims

In orders dated May 14, 1993, and September, 10, 1993, the District Court dismissed or limited all counts of the Amended Complaint, pursuant to Rules 12(b)(1) or 12(b)(6), Fed. R. Civ. P. The majority of the Title VII and NJLAD sex and race discrimination and retaliation claims were dismissed, pursuant to Rule 12(b)(1), for failure to exhaust administrative remedies and for lack of timeliness, including lack of continuing violations; the male appellants' Title VII and NJLAD claims were dismissed under Rule 12(b)(6), for lack of standing to sue. Anjelino v. New York Times, 1993 WL 170209 at *5, 8, 10-11 (D.N.J. May 14, 1993); see also Anjelino, No. 92-2582 (D.N.J. Sept. 10 1993). Pursuant to Rule 12(b)(6), the court limited the surviving sex and race discrimination claims brought under NJLAD to events occurring after June 1990 and the surviving race discrimination claims under Title VII to events occurring after July 1991. The section 1981 sex discrimination claims were dismissed under Rule 12(b)(6) on grounds that they are not cognizable under the statute. Many of the section 1981 race discrimination claims were dismissed for lack of timeliness, pursuant to Rule 12(b)(1). Anjelino, 1993 WL 170209 at *11. The surviving section 1981 race discrimination claims were limited to events occurring after June 1990.

In the Order of May 14, 1993, and in an Order dated August 22, 1996, the court dismissed or limited the

_____

20. The Amended Complaint also added three new plaintiffs-appellants, Maureen Dolphin, Jacqueline Fogarty, and Ronald Plackis, who did not file charges of any kind with the EEOC. Anjelino, 1993 WL 170209 at *4. See discussion infra of exhaustion.

appellants' labor relations claims under section 301 of the LMRA and Title I of the LMRDA. Many claims were dismissed under Rule 12(b)(1) for failure to exhaust and for lack of timeliness. The remaining LMRA claims were limited to events occurring after June 9, 1992. Anjelino, 1993 WL 170209 at *14; Anjelino, No. 92-2582 (D.N.J. Aug. 22, 1996).

In an Order dated July 8, 1993, the court denied the appellants' motion for reconsideration of the May 14 Order. Then, on September 10, 1993, the court denied appellants' motion to review the appropriate statute of limitations under the NJLAD. Anjelino, No. 92-2582 (D.N.J. July 8, 1993).

On January 29, 1996, the court affirmed the magistrate judge's recommendation to deny discovery to the appellants. Anjelino, No. 92-2582 (D.N.J. Jan. 29, 1996). On May 13, 1996, as a result of appellants' motion objecting to the discovery decision, the District Court sanctioned their counsel in the amount of $5,000, pursuant to 28 U.S.C. S 1927, on grounds that the motion was frivolous. Anjelino, No. 92-2582 (D.N.J. May 13, 1996); see also Anjelino, No. 92-2582 (D.N.J. May 1, 1996).

In an Order dated August 22, 1996, the Court granted summary judgment for defendants on the remaining claims of the Hispanic appellants (which had been severed from the claims of the non-Hispanic appellants on October 25, 1995, during the discovery process). These included Title VII sex discrimination claims by three female Hispanics, which related to events occurring after July 1991 and their NJLAD sex discrimination claims for events occurring after July 1990; the Hispanic appellants' race discrimination claims under section 1981 and NJLAD for events occurring after June 1990 and under Title VII, for events occurring after July 1991; the Hispanics' national origin claims under Title VII for events occurring after July, 1991; the Hispanics' retaliation claims under Title VII, NJLAD, and section 1981; and the Hispanics' LMRA claim for events occurring after June 9, 1992. Anjelino, No. 92-2582 (D.N.J. Aug. 22, 1996).

Pursuant to an order dated March 2, 1997, the court dismissed the Amended Complaint in its entirety (i.e., all

remaining claims of the non-Hispanic appellants), including
the remaining Title VII, NJLAD, and section 301 claims.
These claims were dismissed on summary judgment
grounds. Anjelino, No. 92-2582 (D.N.J. Mar. 2, 1997).

III. Jurisdiction and Standards of Review

We exercise appellate jurisdiction over the parties'
appeals pursuant to 28 U.S.C. S 1291.21 The District Court
had subject matter jurisdiction by virtue of 28 U.S.C.
S 1331, as well as 29 U.S.C. SS 185(a) and 412, and 42
U.S.C. S 2000(e). The District Court exercised supplemental
jurisdiction over the pendant state claims pursuant to 28
U.S.C. S 1367(a).

_____

21. In an Order dated April 4, 1996, the magistrate judge severed the
claims of the Hispanic appellants from those of the non-Hispanic
appellants, after finding that discovery had been completed with respect
to the former, but not as to the latter. Subsequently, on May 13, 1996,
the District Court dismissed the claims of the Hispanic appellants. The
claims of the non-Hispanic appellants were dismissed in an Order dated
March 14, 1997. The Hispanic appellants filed an appeal of the May
1996 Order dismissing their claims on March 18, 1998, at the same time
that the appeal of the non-Hispanic appellants wasfiled. Thus, a single
appeal was filed on behalf of all appellants.

The Times argues that the appeal of the Hispanic appellants is
untimely. The Times asserts that the Hispanics' notice of appeal should
have been filed within thirty days of the May 1996 Order dismissing
their claims. We conclude, however, that the Hispanics' notice of appeal
was timely. This case was not appealable to the Third Circuit until the
District Court reached a final disposition of all claims made by all
parties
to this action. See Andrews v. United States, 373 U.S. 334 (1963);
Jackson v. Hart, 435 F.2d 1293 (3d Cir. 1970). The docket sheet in this
action shows that case was closed on March 3, 1998, and that the
record was deemed "complete for purposes of appeal" on March 30,
1998. Thus, the entire controversy was resolved in March of 1998. To
the extent that it is not clear that the entire controversy was not
resolved
until that date, the onus for the uncertainty lies with the court that
issued the order severing the Hispanics' claims during the discovery
process, rather than with the appellants. See Rule 54(b), Fed. R. Civ. P.
(stating that in the absence of an express directive from the District
Court, a judgment upon fewer than all claims or parties to an action
does not terminate the action).

19

As to our scope of review, we will start our analysis with the District Court's dismissal of certain claims under Rule 12(b)(1). The District Court's Opinion and Order of May 14, 1993, dismissed many counts of the complaint for lack of subject matter jurisdiction, based on the appellants' failure to exhaust administrative remedies and on the bar of the statute of limitations. In dismissing these counts under Rule 12(b)(1), the court did not attach any presumption of truthfulness to appellants' allegations but instead put the burden of establishing jurisdiction on appellants. See Anjelino, 1993 WL 170209 at *5, citing Mortensen v. First Federal Sav. And Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977), and Millipore Corp. v. University Patents, Inc., 682 F.Supp. 227, 231 (D. Del. 1987).

There is a fundamental difference between review under Rule 12(b)(1), where existence of disputed material facts will not preclude the court from evaluating the merits of the jurisdictional claim, see Mortensen, 549 F.2d at 891, and review under Rule 12(b)(6), where the court is required to accept as true all the allegations of the complaint and all inferences arising from them, see Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). Our first task is to evaluate the propriety of employing Rule 12(b)(1) in dismissing the counts that failed to meet exhaustion or timeliness requirements. Our review is plenary. Hornsby v. United States Postal Service, 787 F.2d 87, 89 (3d Cir. 1986).

We conclude that the District Court erred in considering the Times' failure to exhaust and timeliness defenses as grounds for dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction. Although it is a "basic tenet" of administrative law that a plaintiff should timely exhaust all administrative remedies before seeking judicial relief, the purpose of this rule is practical, rather than a matter affecting substantive justice in the manner contemplated by the District Court. The rule is meant to "provide courts with the benefit of an agency's expertise, and serve judicial economy by having the administrative agency compile the factual record." Robinson v. Dalton, 107 F.3d 1018, 1020 (3d Cir. 1997). Failure to exhaust is "in the nature of statutes of limitation" and "do[es] not affect the District Court's subject matter jurisdiction." Hornsby, 787 F.2d at

20

89 (citing Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 392-98 (1982)). The characterization either of lack of exhaustion or of untimeliness as a jurisdictional bar is particularly inapt in Title VII cases, where the courts are permitted to equitably toll filing requirements in certain circumstances. Robinson, 107 F.3d at 1021 (citing Bowen v. City of New York, 476 U.S. 467, 482 (1986)).

Thus, the District Court should have considered the exhaustion and timeliness defenses presented in this case under Rule 12 (b)(6), rather than under Rule 12(b)(1). Robinson, 107 F.2d at 1022; accord Rennie v. Garret III, 896 F.2d 1057, 1061-62 (7th Cir. 1990). As a result, we will test the exhaustion and timeliness defenses under Rule 12(b)(6) or Rule 56, as appropriate.

Our review of the District Court's dismissal of appellants' Title VII, NJLAD, and section 1981 claims pursuant to Rule 12(b)(6) or Rule 56 is plenary. Ingram v. County of Bucks, 144 F.3d 265, 267 (3d Cir. 1998); Lake v. Arnold, 112 F.3d 682, 684-85 (3d Cir. 1997). To the extent that the court considers evidence beyond the complaint in deciding a Rule 12(b)(6) motion, it is converted to a motion for summary judgement. Rule 12(c); see also Robinson, 107 F.3d at 1021.

As with the anti-discrimination statutes, our review of the District Court's dismissal of appellants' LMRA and LMRDA claims on grounds of timeliness and failure to exhaust administrative remedies is plenary. Likewise, our review is plenary where the court granted summary judgment on the appellants' labor claims, pursuant to Rule 56(c). See Brenner v. Local 514, United Brotherhood of Carpenters & Joiners of America, 927 F.2d 1283, 1287 (3d Cir. 1991).

We review the District Court's order affirming the magistrate judge's decision denying discovery to the appellants, as well as the Court's imposition of sanctions, under an abuse of discretion standard. See Bayar AG v. Betachem, Inc., 173 F.3d 188, 189-90 (3d Cir. 1999); Fellheimer, Eichen & Braverman v. Charter Tech, Inc ., 57 F.3d 1215, 1223 (3d Cir. 1995).

21

IV. Discussion

A. Matters Dismissed on Preliminary Grounds

We will start our consideration of the issues on appeal
with the counts dismissed by the District Court on grounds
of standing, failure to exhaust, and timeliness.

1. Title VII and NJLAD Sex and Race Discrimination and
      Retaliation Claims

      a. Standing of Males to Sue for Sex Discrimination

A party invoking federal jurisdiction must establish that
he has standing to sue within the meaning of Article III,
section two of the Constitution, which limits the courts to
hearing actual cases or controversies.[22]  Standing is
established at the pleading stage by setting forth specific
facts that indicate that the party has been injured in fact or
that injury is imminent, that the challenged action is
causally connected to the actual or imminent injury, and
that the injury may be redressed by the cause of action.
See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–
61 (1992); Valley Forge Christian College v. Americans
United for Separation of Church and State, Inc., 454 U.S.
464, 473 (1982). Courts assess whether a party has
established injury–in–fact, causation, and redressability by
considering whether the alleged injury falls within the "zone
of interests" that the statute or constitutional provision at
issue was designed to protect; whether the complaint raises
concrete questions, rather than abstract ones that are
better suited to resolution by the legislative and executive
branches; and whether the plaintiff is asserting his own
legal rights and interests, as opposed to those of third
parties. See, e.g., Lujan, 504 U.S. at 561–62. The requisite
injury may be economic or non–economic in nature. United
States v. SCRAP, 412 U.S. 669, 686 (1973); Ass'n. of Data
Processing Serv. Org., Inc. v. Camp, 397 U.S. 150, 152

_____

22. Article III, section 2 of the United States Constitution states, in
pertinent part, "The judicial Power shall extend to all Cases, in Law or
Equity, arising under this Constitution, the Laws of the United States ...
––to Controversies ... between Citizens of different States; ...." U.S.
Const., art. III, sec. 2

(1970). The causation element requires that the injury "fairly can be traced to the challenged action." Whitmore v. Arkansas, 495 U.S. 149, 155 (1990). The redressability prong of the standing test is meant to ensure that the facts involved in a suit are conducive to judicial resolution and are likely to be resolved by court action. Valley Forge, 454 U.S. at 472.

In dismissing the male appellants' sex discrimination claims for lack of standing, the District Court reasoned that, to the extent that discrimination had occurred in the Times' mail room, it had been directed at females; thus, the male workers had not suffered harm and could not assert cognizable claims of sex discrimination. Anjelino, 1993 WL 170209 at *10–11. This conclusion was predicated upon the court's understanding that, as a general matter, men do not have standing to bring claims of sex discrimination under Title VII. Id. at *10 (citing Spaulding v. University of Washington, 740 F.2d 686, 709 (9th Cir.), cert. denied, 469 U.S. 1036 (1984)).

Relying on two Ninth Circuit cases, the court acknowledged, however, that three exceptions to this rule have been recognized. Anjelino, 1993 WL 170209 at *9–10 (citing Patee v. Pacific Northwest Bell Tel. Co., 803 F.2d 476, 478 (9th Cir. 1986); Spaulding, 740 F.2d at 709). The court found that a cause of action may lie under Title VII if male employees are subjected to discrimination"because they are men." Patee, 803 F.2d at 478. Second, reasoning by analogy from the Supreme Court's associational standing precedent in the context of race discrimination, the court concluded that male employees may sue under Title VII if discrimination directed at women results in a loss of interpersonal contacts or associational rights with women. Anjelino, 1993 WL 170209 at *10 (citing Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 209–10 (1972)). Third, based on a ruling by a federal district court in Indiana, the court concluded that a cause of action may lie if sex–based discrimination results in pecuniary injury to both male and female workers. Anjelino, 1993 WL 170209 at *10 (citing Allen v. American Home Foods, Inc., 644 F. Supp. 1553, 1557 (N.D. Ind. 1986)).

23

The District Court concluded that the injuries alleged by the male appellants in this action did not fall within any of these three categories. Therefore, the court held that the male appellants lacked standing to assert claims under Title VII and the NJLAD. Anjelino, 1993 WL 170209 at *10. The court did not, however, analyze appellants' claim that they suffered pecuniary injury because they were numbered on the priority list among women, who were not hired due to sex discrimination because hiring stopped when the women's names were reached. The court simply concluded, without further comment, that the alleged "multiple discriminatory acts aimed against women directly" were "without consequence to the male employees." Id.

On appeal, the Times agrees in part with the District Court and argues that it is a well-settled proposition that men do not have standing to sue for discrimination against women. The Times rejects, however, the associational and pecuniary theories of male standing to sue for sex discrimination derived from Trafficante, 409 U.S. at 209-10, and Allen, 644 F. Supp. at 1557, and contends that men may sue for sex discrimination only if they experience discrimination because they are men. The Times argues that it was proper to dismiss the male appellants' claims because these claims are based not on the male appellants' sex but "on their membership in a group with low-priority list placement that also included the female appellants and others who are not appellants." The Times does not, however, analyze whether the male appellants could state a colorable claim of injury-in-fact if they were not hired because they were listed among women who were not hired.

The appellants argue to the contrary that the male appellants do have standing to sue based on discrimination directed, in the first instance, against female co-workers, because these males would not have been injured but for the Times' discrimination against the women. When the male appellants appeared at daily "shapes" for hiring, they were "sandwiched among the women on the priority list" and were not hired if the hiring stopped when the names of women on the priority list were reached. Thus, they suffered from the discrimination as well.

24

Appellants assert that their position on standing is supported by our decision in Hackett v. McGuire Brothers Inc., 445 F.2d 442 (3d Cir. 1971). We agree. In Hackett, the plaintiff, because of his race, had been subjected to a separate seniority and vacation schedule, intimidated, harassed, and ultimately discharged. Id. at 444-45. The District Court dismissed the plaintiff's Title VII claim for lack of standing because he had become a pensioner after being discharged by the defendant-company; thus, he was no longer an "employee" within the meaning of Title VII. Id. at 445. We reversed and emphasized our obligation to avoid construing the standing doctrine in ways that undermine Congress' objective in enacting Title VII.

> The national public policy reflected . . . in Title VII . . . may not be frustrated by the development of overly technical judicial doctrines of standing . . .. If the plaintiff is sufficiently aggrieved so that he claims enough injury in fact to present a genuine case or controversy in the Article III sense, then he should have standing to sue in his own right and as a class representative.

Id. at 446-47 (emphasis added).

In Hackett, we found Article III's case or controversy requirements to have been satisfied by the plaintiff 's allegations that demonstrated that he was a "person aggrieved" as required by the statute; he was"aggrieved" because he alleged that the employer had injured him in violation of Title VII while he was employed there. Id. at 445. We concluded that at the pleading stage nothing beyond a colorable allegation of injury is required of the Title VII plaintiff. In Hackett, where the plaintiff claimed pecuniary loss, it was clear that the plaintiff had met his burden. Id. at 446 (citing Flast v. Cohen, 392 U.S. 83, 101 (1968)).

Our decision in Hackett was cited with approval in Trafficante, 409 U.S. at 209, the seminal associational standing case in the race discrimination context. In Trafficante, the Supreme Court found that two tenants who alleged a loss of the social and professional benefits of living in an integrated community, due to landlords' alleged

25

discrimination against racial minorities, had standing to sue under Title VIII of the Civil Rights Act of 1968, 42 U.S.C. S 3610(a).23 Id . at 212. Like our analysis in Hackett, the Trafficante Court's analysis was textual. The Court rejected an interpretation of Title VIII that would limit persons entitled to sue to "objects of discriminatory housing practices" because it found the definition of"person aggrieved" contained in section 810(a) of Title VIII -- "(a)ny person who claims to have been injured by a discriminatory housing practice" -- to be "broad and inclusive." Id. at 208. Thus, the Court concluded, "We can give vitality to [the Act] only by a generous construction which gives standing to sue to all in the same housing unit who are injured by racial discrimination in the management of those facilities within the coverage of the statute." Id. at 212.

Subsequently, in Novotny v. Great Am. Fed. Savings & Loan Assn., 584 F.2d 1235 (3d Cir. 1978), rev'd on other grounds, 442 U.S. 366 (1979), we affirmed our view that the statutory language, "person claiming to be aggrieved," implied a Congressional intent to be liberal in allowing suits that effectuate the purposes of anti-discrimination statutes. In Novotny, we allowed a male plaintiff, who claimed to have been discharged for failing to adhere to a company policy of sex discrimination against women, to sue under 42 U.S.C. S 1985. Id. at 1240-45. Our holding in Novotny was predicated upon the similarity in purpose and semantic structure between Title VII's enforcement provision and section 1985.24 Many courts have expressly

_____

23. Title VIII is analogous to Title VII. Title VIII states, in pertinent part,
"Any person who claims to have been injured by a discriminatory housing practice or who believes that he will be irrevocably injured by a discriminatory housing practice that is about to occur may file a complaint with the Secretary [of Housing and Urban Development]." 42 U.S.C. S 3610(a).

24. Cf. id. at 1244, "Section 1985(3) provides for a cause of action in any
instance where `in furtherance of the object of' a proscribed conspiracy an act is done `whereby another is injured in his person or property.' By its terms, the statute gives no hint of any requirement that the `other' must have any relationship to the `person or class of persons' which the conspiracy seeks to deprive of equal protection, privileges or immunities," to Hackett, 445 F.2d at 445"[Section 706, 42 U.S.C. S 2000e-5] permits `a person claiming to be aggrieved' to file a charge with the Commission. . . . A person claiming to be aggrieved may never have been an employee of the defendant. . . . An aggrieved person obviously is any person aggrieved by any of the forbidden practices."

followed our reasoning and/or precedent concerning the significance of the language "person aggrieved" in construing Title VII's standing requirements in the race discrimination context.25

Our case law also addresses the causation element of standing. In Rosen v. Public Service Elec. and Gas Co., 477 F.2d 90 (3d Cir. 1972), we considered causation in our analysis of standing in a Title VII case. Rosen  involved a retiree who challenged his former company's policy of linking an employee's sex with his or her required retirement age for full pension benefits. The trial court had found that when the plaintiff retired, he lost standing. Id. at 92-94. Our standing analysis was based on the plaintiff 's status as an active employee at the time that the suit was commenced, id. at 94, and the pecuniary nature of plaintiff 's alleged injury. We observed that we had to determine whether "there is a logical nexus between the status asserted and the claim sought to be adjudicated." Id. (citing Flast, 392 U.S. at 102). Because the plaintiff 's

_____

25. See EEOC v. Mississippi College, 626 F.2d 477, 482 (5th Cir. 1980), cert. denied, 453 U.S. 912 (1981) ("We agree with other circuits that have held that the strong similarities between the language, design, and purposes of Title VII and [Title VIII] require that the phrase `a person claiming to be aggrieved' in [Title VII] must be construed in the same manner Trafficante construed the term"aggrieved person' in [Title VIII].");
accord Clayton v. White Hall School District, 875 F.2d 676, 679-80 (8th Cir. 1989) (holding that white woman who was not object of discrimination, but who alleged injury because of race discrimination against another, was a "person aggrieved" within the meaning of Title VII); Stewart v. Hanson, 675 F.2d 846, 850 (7th Cir. 1982) (finding white woman who had been deprived of interracial associations in workplace a "person aggrieved" within meaning of Title VII); EEOC v. Bailey Co., 563 F.2d 439, 451-54 (6th Cir. 1977), cert. denied, 435 U.S. 915 (1978) (holding that white female had standing under Title VII to challenge her employee's alleged racial discrimination against blacks); Waters v. Heublein, Inc., 547 F.2d 466, 469 (9th Cir. 1976), cert. denied, 433 U.S. 915 (1977) (holding that white woman who sued under Title VII to enjoin racially discriminatory employment practices was"aggrieved person" within meaning of the statute); Gray v. Greyhound Lines, East, 545 F.2d 169, 175 (D.C. Cir. 1976) (holding that blacks who were not subjected to racial discrimination had standing under Title VII to sue over discrimination against other blacks).

alleged harm from the company's sex-based policies was not theoretical but involved actual economic harm, we concluded that he had been "subject to the discriminatory provisions of the pension plans under consideration." He would, therefore, be allowed to assert his claim. Id.

In Hospital Council v. City of Pittsburgh, 949 F.2d 83, 87 (3d Cir. 1991), we again discussed causation as a part of our analysis of standing. Hospital Council involved alleged threats by a city and county to discriminate against an association of non-profit, tax-exempt hospitals in matters relating to taxation, zoning, and public contracts if the hospitals did not make "voluntary" payments in lieu of taxes. 949 F.2d at 85. Although the complaint of the hospitals had alleged past and imminent harm, id ., the District Court dismissed the case for lack of standing on the theory that the alleged harm was not "real injury" that was "fairly traceable" to defendants' actions, but "purely hypothetical." Id. at 86. We reversed, explaining that

> The complaint alleged a classic form of qualitatively concrete injury -- direct financial harm. The complaint alleged that members had been subjected to and were threatened with discrimination in the initiation of tax exemption challenges, the handling of zoning matters, and the awarding of public contracts. It is obvious that discrimination of this type is likely to cause direct financial harm to the victims.

Id. at 87. Accord Allen, 664 F. Supp. at 1553-57 (finding that males who had been terminated after firm-wide downsizing had standing to sue under Title VII, where they argued that management had closed the facility in question because it primarily employed women, whose jobs were deemed expendable).

Because the male appellants here have pled specific facts to demonstrate a concrete injury as well as a nexus between the alleged injury and the sex-based discrimination, even though that discrimination was aimed in the first instance at others, we conclude that they have established standing. Their allegations that sex discrimination adversely affected their being hired as extras, as well as their seniority on the priority list,

28

demonstrate actual injury. We hold that indirect victims of sex-based discrimination have standing to assert claims under Title VII if they allege colorable claims of injury-in-fact that are fairly traceable to acts or omissions by defendants that are unlawful under the statute. That the injury at issue is characterized as indirect is immaterial, as long as it is traceable to the defendant's unlawful acts or omissions. SCRAP, 412 U.S. at 689 n.14; Hospital Council, 949 F.2d at 87.26

We will, therefore, reverse the District Court'sfinding that the male appellants lack standing to assert their Title VII claims.27

The foregoing analysis is equally applicable to the District Court's dismissal for lack of standing of the male appellants' NJLAD claims. This result is suggested by the substantive law construing various aspects of the NJLAD that has been developed by the New Jersey courts, including the state law on standing. See, e.g., Craig v. Suburban Cablevision, Inc., 660 A.2d 505, 507-09 (N.J. 1995) (holding that relatives and friends of person who brought employment discrimination claim under NJLAD had standing to bring retaliatory discharge claim against their common employer); see also Erickson v. Marsh & McLennan Co., Inc., 569 A.2d 793, 798-99 (N.J. 1990) (explaining that New Jersey supreme court has adopted methodology of proof used in Title VII cases for NJLAD cases); Shaner v. Horizon Bancorp., 561 A.2d 1130, 1132 (N.J. 1989) (noting that LAD standards "have been influenced markedly by experience derived from litigation

---

26. In fact, Hackett, 445 F.2d at 445-46, Rosen, 477 F.2d at 94, and Hospital Council, 949 F.2d at 87, arguably stand for the proposition that, where the alleged harm is pecuniary, a Title VII action should be characterized as involving direct discrimination, as opposed to indirect discrimination, even if the plaintiffs were not the objects of bias in the first instance. Since other courts have termed such discrimination "indirect" and we find the terminology irrelevant to our standing analysis, however, we will not base our holding on this reading of our precedent.

27. Because appellants limit their eligibility for standing to the pecuniary harm theory, we will not address the propriety of asserting, in the employment context, an associational claim for standing.

29

under federal anti-discrimination statutes"). This result is also suggested by the structural similarities between Title VII and the New Jersey anti-discrimination law, as discussed more fully infra in Section IV.B.

b. Failure to Exhaust

i. Sexual Harassment Claims

The District Court's dismissal of the female appellants' hostile work environment sexual harassment claims was based on its determination that their EEOC charges did not state a complaint of sexual harassment. As the court framed the issue, its concern with the charges related to "whether appellants' EEOC complaint was worded sufficiently to place the EEOC on notice of appellants' hostile work environment claims." Anjelino, 1993 WL 170209 at *9. Because appellants referred in their initial EEOC charges to an "abusive atmosphere" rather than to a "hostile work environment," the District Court concluded that the appellants' charges were too vague to give notice of sexual harassment claims. Id. Based on its view that an appreciable difference exists between the terms "abusive atmosphere" and "hostile work environment," the District Court dismissed the sexual harassment claims for failure to exhaust administrative remedies. Id. The legal precedent cited by the court was Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208, 1212 (3d Cir. 1984) and Ostapowicz v. Johnson Bronze Co., 541 F.2d 394 (3d Cir. 1976). The court construed these cases as supporting its view that the phrases "abusive atmosphere" and "hostile work environment" are sufficiently different to warrant the dismissal of the appellants' sexual harassment claims. Anjelino, 1993 WL 170209 at *9.

We do not agree, however, either with the interpretation given by the District Court to Howze and Ostapowicz or with the result at which the District Court arrived. Our disagreement is best explained by starting with our discussion in Ostapowicz of why a preliminary EEOC claim is necessary.

Ostapowicz was a Title VII class action in which an employer was found to have engaged in sex discrimination

30

in job classifications, resulting in women being laid-off from work, while men with less seniority were either retained or recalled to work at an earlier date than the women. 541 F.2d at 396-97. In Ostapowicz, we set out the procedures for filing discrimination claims and the reasons for following these procedures: When an "aggrieved person" files a claim with the EEOC, the agency notifies the employer and conducts an investigation. If the charge reasonably appears to be true, the EEOC attempts conciliation. If conciliation does not succeed, the EEOC notifies the aggrieved party of his or her right to bring suit. The preliminary step of the filing of the EEOC charge and the receipt of the right to sue notification are "essential parts of the statutory plan, designed to correct discrimination through administrative conciliation and persuasion if possible, rather than by formal court action." Id. at 398. Because the aim of the statutory scheme is to resolve disputes by informal conciliation, prior to litigation, suits in the district court are limited to matters of which the EEOC has had notice and a chance, if appropriate, to settle. Id. at 398.

In Ostapowicz, the defendants claimed on appeal that the District Court had lacked jurisdiction to hear the case because the right to sue letter, upon which the plaintiff relied in filing suit, and the EEOC's initial report in the case only concerned employees in the company's shipping division. The plaintiff worked in a different division. Subsequently, however, the plaintiff filed additional EEOC charges that related to the division in which she worked. Id. at 399. Several months after the additional charges were filed, the plaintiff and certain of her co-workers requested and received right to sue letters from the EEOC. In the suit against the employer, the plaintiff and other members of the class referred to both the initial and subsequent EEOC charges.

On these facts, we rejected the defendant's argument that the scope of the initial charges deprived the trial court of jurisdiction to hear the case. We found that the additional charges, which were filed during the pendency of the administrative proceedings, "may fairly be considered explanations of the original charge and growing out of it." Id. In this way, we affirmed that the "parameters of a civil

31

action in the District Court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occurred during the pendency of proceedings before the Commission." Id. at 398-99 (citing Gamble v. Birmingham Southern R.R. Co., 514 F.2d 678 (5th Cir. 1975); Oubichon v. North Am. Rockwell Corp., 482 F.2d 569 (9th Cir. 1973)).

Because the EEOC had cognizance of the full scope of the situation during its settlement efforts, the purpose of the notification requirement had been served.

In Hicks v. ABT Assoc. Inc., 572 F.2d 960 (3d Cir. 1978), we arrived at the same conclusion concerning the nature of the filing requirement and its effect on the court's subject matter jurisdiction in discrimination suits. In Hicks, the plaintiff had filed claims of race discrimination and retaliation with the EEOC. His subsequent law suit also contained a claim for sex discrimination. The District Court dismissed this claim on the ground that it was jurisdictionally barred because Hicks had not filed a sex discrimination charge with the EEOC. Hicks claimed that he had attempted to amend his charge but that the EEOC had refused to accept the amendment. In view of this factual disparity, we reversed, holding that a court could hear a claim of sex discrimination where it was unclear whether the EEOC had improperly refused to amend charges, and commenting that the "charges are most often drafted by one who is not well versed in the art of legal description. . . . [T]he scope of the original charge should be liberally construed." Id. at 965. We pointed out that the purpose of the filing requirement is to enable the EEOC to investigate and, if cause is found, to attempt to use informal means to reach a settlement of the dispute. Id. at 963. If the complaint is not well founded or if reconciliation is not successful, a right to sue letter is issued to the complainant.

> Thus, the effect of the filing requirement is essentially to permit the EEOC to use informal, non-judicial means of reconciling the differences between the charging party and an employer.

32

Id. (citing Ostapowicz).

Once again, in Howze, a Title VII suit in which the plaintiff alleged that she had been denied a promotion due to racial discrimination, we reversed the District Court's determination that the plaintiff could not amend her complaint to include a claim of retaliation. 750 F.2d at 1209-12. The defendant argued that the plaintiff should not have been given leave to amend her complaint because no evidence had been presented that the retaliation claim was ever submitted to the EEOC. Id. at 1212. The court found, however, that, as in Ostapowicz, the plaintiff's "new retaliation claim may fairly be considered [an] explanation[ ] of the original charge . . .." Id. (citations omitted) (relying on Hicks to hold that EEOC investigation does not set outer limits on the scope of the civil complaint.) Moreover, the EEOC completed its investigation and determined that there was no reasonable cause to believe that the employer had discriminated against Howze before it issued its right to sue letter.

In light of the precedent established by Ostapowicz, Hicks, and Howze, we do not find, as the Times claims, that these cases support its position that the appellants failed to exhaust their administrative remedy on the sexual harassment claim. We conclude to the contrary that appellants' notification of their charges was sufficient because the terms "abusive," "hostile,""environment," and "atmosphere" have been used interchangeably to describe sexual harassment. In particular, appellants support the sufficiency of their charges with references to recent Supreme Court and Third Circuit decisions concerning sexual harassment. See, e.g., Meritor Savings Bank FSB v. Vinson, 477 U.S. 57, 64, 66-67 (1986); Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 23 (1993); Knabe v. Boury Corp., 114 F.3d 407, 410 (3d Cir. 1997); West v. Philadelphia Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995); Spain v. Gallegos, 26 F.3d 439, 445-47, 449 (3d Cir. 1994).

We agree with the appellants that the terms are interchangeable. This interchangeability convinces us that the harassment charge was within the scope of the complaints before the EEOC. See Ostapowicz, 541 F.2d at

33

396–97; Howze, 750 F.2d at 1212; Hicks, 572 F.2d at 964–65.[28]

The foregoing analysis also applies to the dismissal of the female appellants' NJLAD sexual harassment claims for failure to exhaust administrative remedies. This result is suggested by the similarities between the procedural requirements of Title VII and NJLAD, and the work-sharing agreements between the two agencies, pursuant to which the NJDCR deferred handling of the NJLAD claims to the EEOC. See App. at 490–94 (letter from NJDCR identifying charges investigated by the EEOC pursuant to work sharing agreement); see also 29 C.F.R. SS 1601.13(a)(4)(ii), 1626.10(c) (describing work-sharing agreements between

_____

28. Because we find the terms interchangeable, we will not go to consider what further information, such as the original complaint with its section entitled "Hostile Work Environment" or the appellants' January 5, 1993, affidavits, the EEOC would have had the opportunity to consider if it had completed its investigation, rather than issuing the right to sue letters prior to its completion. The present case differs from Ostapowicz, Hicks, and Howze in that the EEOC did not perform any in-depth investigation and made no attempt at reconciliation. Moreover, the EEOC acknowledged that it could not complete its investigation within the statutory 180 days; for this reason, the EEOC stated that it would issue the right to sue letters so that the appellants could proceed in court without waiting for any further investigation by the EEOC. If, however, the EEOC had pursued its investigation, it would have had before it not only the original charges, alleging "abusive atmosphere" but also a copy of the original district court complaint and the affidavits. In a case in which the EEOC has conducted a complete investigation, it will have presumptively prepared a report explaining the reasons for its recommendation; completed a running case log indicating all actions taken in the case, 1 EEOC Compliance Manual (BNA),S 22.16 & 22.17, at 22:0012; id S 29, at 29:0001–04; and assembled a file containing the investigator's work product, jurisdictional items, and relevant evidence. Id. at S 28, at 28:0001–02. When we held in Ostapowicz and Howze that the scope of a Title VII action in federal District Court is determined by the initial charges filed with the EEOC and subsequent explanations or outgrowths of these charges, we did so in cases in which such an investigation of the charges had been conducted and records of the EEOC's actions had been compiled. We will leave to another day the question whether the EEOC should be presumed to have notification of such subsequently filed allegations when it does not complete its investigation prior to issuing the right to sue letter.

34

EEOC and state agencies); id. at S 1601.70 & 1601.71 (describing deferral process).

However, our conclusion as to the claims against the Times does not apply to the claims against the Union. The District Court's dismissal of all Title VII and NJLAD claims brought by the appellants against the Union and appellee McDonald is affirmed. We will affirm the dismissal of all claims against the Union because the Union was not the employer of the appellants; this is so even though some of the supervisors and workers who are alleged to have discriminated against the appellants may have been members of the Union. While a union may be held liable under Title VII, the record here does not demonstrate that the Union itself instigated or actively supported the discriminatory acts allegedly experienced by the appellants. Therefore, the Union is not liable. See Carbon Fuel Co. v. United Mine Workers, 444 U.S. 212, 217-18 (1979); Berger v. Iron Workers, Local 201, 843 F.2d 1395, 1429-30 (D.C. Cir. 1988); see Philadelphia Marine Trade Assoc. v. Local 291 Int'l. Longshoremen's Ass'n., 909 F.2d 754, 757 (3d Cir. 1990). Rather, the Times was the party responsible for assigning work to the appellants and ensuring that the work place was not contaminated with sex- and race-based discrimination and harassment.29

We will also affirm the dismissal of the Title VII and NJLAD claims brought against the Union because the appellants have not demonstrated that they exhausted the Union's internal grievance procedures before filing administrative charges with the EEOC and this civil action.30 We find that the appellants' failure to exhaust internal administrative remedies negatively impacts their ability to prove the Union liable under Title VII and the NJLAD. We discuss more fully our reasoning regarding the appellants' failure to exhaust the Union's internal grievance procedures infra, in Section IV.A.3.

_____

29. See App. at 105, 1103, 1136.

30. See, e.g., App. at 1682, 1767, 2387.

## ii. Retaliation Claims

The District Court noted that the EEOC had not issued right to sue letters to the appellants regarding their retaliation claims and then dismissed these claims for failure to exhaust administrative remedies. See Anjelino, 1993 WL 170209 at *10. We will reverse this dismissal of the retaliation claim for failure to exhaust administrative remedies on essentially the same basis as we reverse the court's dismissal of the female appellants' hostile work environment claim.

In the case at bar, the alleged retaliatory delistment occurred after the appellants initiallyfiled administrative charges in May and June of 1992, and after they originally filed a complaint in June of 1992. Thus, it would have been impossible for the appellants to have included the retaliatory delistment among their initial charges and original complaint.

While the record does not show that the appellants requested right to sue letters from the EEOC prior to filing their Amended Complaint, for the reasons stated supra, we will not penalize the appellants for the EEOC's failure to follow up on the retaliatory discharge charges, or for their attorneys' failure to request right to sue letters, where the appellants were entitled to such letters as a matter of right, 29 C.F.R. S 1601.28(a)(2), and where letters had been received with respect to the initial charges. Under these circumstances, and in light of the numerous allegations of discrimination contained in the record, we will reverse this dismissal for failure to exhaust. See Zipes, 455 U.S. at 392–98; Robinson, 107 F.3d at 1021; Hornsby , 787 F.2d at 89. We find support for this conclusion in Ostapowicz, 541 F.2d at 398–99 (the "parameters of a civil action in the District Court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charges of discrimination, including new acts which occurred during the pendency of proceedings before the Commission"), and Howze, 750 F.2d at 1212 (plaintiff's "new retaliation claim may fairly be considered[an] explanation[ ] of the original charge"). Moreover, we have held that the failure to obtain a right-to-sue letter, in particular a second one for a retaliation claim, is curable at

36

any point during the pendency of the action. Gooding v. Warner–Lambert Co., 744 F.2d 354, 357–59 (3d Cir. 1984) (eschewing "highly technical pleading rules, which only serve to trap the unwary practitioner," in favor of notice pleading; reversing dismissal of Title VII action where second right–to–sue letter issued after complaintfiled); accord Williams v. Washington Metro. Area Transit Auth., 721 F.2d 1412, 1418 n. 12 (D.C. Cir. 1983); Fouche v. Jekyll Island–State Park Auth., 713 F.2d 1518, 1525 (11th Cir. 1983). Under these circumstances, we find that the appellants acted with due diligence.31

### c. Timeliness

### i. Sex and Race Discrimination and Retaliation Claims under Title VII

Of the sex and race discrimination claims that survived dismissal on other grounds, the Court limited those brought under NJLAD to events occurring after June 1990 and those brought under Title VII to events occurring after July 1991. This dismissal for lack of timeliness was based on the court's determination that, except for their delistment, the appellants had not alleged a single objectionable policy or practice that occurred within the limitations period. Anjelino, 1993 WL 170209 at *7. The court reasoned that the appellants would not be able to prove by a preponderance of the evidence that their claims were not stale or that their allegations met the standards for applying the continuing violations theory of timeliness. Id. at *6–8.

However, as we discuss supra in Part III, the District Court reviewed these claims under Rule 12(b)(1) rather than under Rule 12 (b)(6) or Rule 56. In doing so, the court failed to consider the significance of the fact that the appellants claimed that certain alleged acts of

_____

31. The Amended Complaint also added three new plaintiffs, Maureen Dolphin, Jacqueline Fogarty, and Ronald Plakis, who had not filed charges of any kind with the EEOC. The appellants have not mentioned the dismissal of these three plaintiffs in their briefs; we do not, therefore,
address this issue.

discrimination took place within the limitations period. The Times disputed these claims of timeliness before the District Court and continues to do so on appeal. Thus, whether any of the claims were timely is a question of disputed material fact. See, e.g., Hicks, 572 F.2d at 963-66. Rather than weighing the credibility of the parties' positions on this disputed issue, the District Court should under Rule 12 (b)(6) and Rule 56 have left such considerations to a jury. See Williams v. Borough of West Chester , 891 F.2d 458, 460 (3d Cir. 1989); Anderson, 477 U.S. at 248.

      ii. Sex and Race Discrimination and Retaliation
      Claims under NJLAD

We also find that the District Court erred in dismissing the appellants' NJLAD claims for lack of timeliness. Our decision regarding the timeliness of the appellants' NJLAD claims is controlled by Montells v. Haynes, 627 A.2d 654 (N.J. 1993). In Montells, the Supreme Court of New Jersey held that a two year statute of limitations applies to all NJLAD claims. Id. at 659-61. Prior to Montells, it had not been clear whether NJLAD claims were subject to a six year or a two year statute of limitations. Id. at 661. Whereas New Jersey courts generally had applied the shorter term, Leese v. Doe, 440 A.2d 1166, 1168 (N.J. 1981), the federal courts tended to apply the longer limitations period. See White v. Johnson & Johnson Prod., Inc., 712 F. Supp. 33 (D.N.J. 1989) (applying six year limitations period); United States v. Bd. of Educ., 798 F. Supp. 1093, 1095 (D.N.J. 1992) (same).

Although the Montells court found that the two year statute of limitations would apply uniformly to all NJLAD claims, the court held that its decision would only apply prospectively. 627 A.2d at 661-62. Thus, all claims filed prior to July 23, 1993, the date that the opinion was issued, were subject to a six year limitations period. Under Montells, the appellants' NJLAD claims, which were filed in August of 1992, are subject to the six year statute. Thus, these claims are not time-barred.

38

2. Section 1981 Sex and Race Discrimination and
        Retaliation Claims

a. Sex Discrimination and Retaliation Claims

The section 1981 claims brought by Hispanic women for
alleged sex discrimination and/or harassment were
dismissed by the District Court on ground that gender-
related claims are not cognizable under this statute.
Anjelino, 1993 WL 170209 at *11. We will affirm the District
Court's dismissal of the gender related claims on this basis.
Because the statute, on its face, is limited to issues of
racial discrimination in the making and enforcing of
contracts,32 courts have concluded that sex-based claims
are not cognizable under 42 U.S.C. S 1981. See, e.g., Bobo
v. ITT, Continental Baking Co., 662 F.2d 340, 343 (5th Cir.
1981) ("The drafters of [section] 1981 had no intention to
disturb public or private authority to discriminate against
women."); Montano v. Amstar Corp., 502 F. Supp. 295, 296-
97 (E.D. Pa. 1980) (denying motion by African-American
woman to amend her complaint to include sexual
harassment claim); see also Runyon v. McCrary , 427 U.S.
160, 167 (1976) (dictum).

        b. Race Discrimination and Retaliation Claims

The District Court limited the Hispanic appellants'
section 1981 race discrimination claims to events occurring
after June 1990. Anjelino, 1993 WL 170209 at *11. The
court reasoned that the claims should be so limited
because the appellants were unable to demonstrate
continuing violations. Id.

Based on our reasoning concerning the timeliness of the
NJLAD claims, we will reverse the dismissal of the section
1981 racial discrimination and retaliation claims. We do so
because in cases decided prior to Wilson v. Garcia, 471 U.S.
261 (1985), the federal courts, for purposes of establishing
a limitations period, analogized section 1981 claims to
_____

32. 42 U.S.C. S 1981 provides, in pertinent part, that "[a]ll persons
within the jurisdiction of the United States shall have the same right in
every State ... to make and enforce contracts ... as is enjoyed by white
citizens...." 42 U.S.C. S 1981.

claims under state limitations periods, either personal injury or breach of contract claims. See, e.g., Runyon, 427 U.S. at 180–82 (affirming application of state two year personal injury statute of limitations to section 1981 claims). This borrowing was necessary because section 1981 does not contain a limitations period. See Johnson v. Ry. Express Agency, 421 U.S. 454, 464–65 (1975). As we discuss above, prior to Montells, NJLAD claims were subjected to the same limitations analysis. See , e.g., White, 712 F. Supp. at 34–35 (D.N.J. 1989). Furthermore, when an action contained both section 1981 and NJLAD claims, the courts presumed that the same statute of limitations would apply. Id. Prior to Montells, the federal courts in New Jersey would apply a two or a six year statute of limitations to section 1981 and NJLAD claims, based on whether a court analogized a claim as one for personal injury or contract.

As explained above, however, the federal courts no longer have to guess which statute of limitations applies to NJLAD claims. In Montells, the New Jersey Supreme Court decided that a two year statute of limitations should apply to all NJLAD claims. 627 A.2d at 659. The Montells court determined, however, that the two year limitations period would not apply to cases filed prior to the date of that decision.

We adopt the reasoning of the Montells court and find that the appellants, who filed the instant section 1981 action prior to the decision in Montells and who may reasonably have relied on cases applying the longer period to both section 1981 and NJLAD claims, are entitled to a six year limitations period. Accord Al–Khazraji v. St. Francis College, 784 F.2d 505, 511–14 (3d Cir. 1986), aff'd, 481 U.S. 604, 607–10 (1987) (refusing to apply Pennsylvania personal injury statute of limitations retroactively when there was no reliable holding which statute of limitations applied when appellant's section 1981 claims arose); White, 712 F. Supp. at 34–35 (applying six year statute of limitations to NJLAD claims and section 1981 claims to avoid injustice of applying new limitations period occasioned by change in substantive law retroactively).

The foregoing analysis does not apply to the Union defendants for the reasons cited in the Section IV.A.1.b. For

40

the reasons stated there, we will affirm the dismissal the
Title VII and NJLAD claims against the Union.

3. LMRA and LMRDA Claims

The Court dismissed the appellants' claims against the
Union, McDonald, and the Times under the LMRA on
grounds of timeliness, Anjelino, 1993 WL 170209 at *12-13,
and because the Court determined that the appellants had
not exhausted the Union's internal remedies prior to filing
suit. Id. at *13. Likewise, appellants' claims under Title I of
the LMRDA were dismissed for failure to exhaust and lack
of timeliness.

We will affirm the dismissal of these claims because the
appellants have not demonstrated that they exhausted the
Union's internal grievance procedures prior to filing charges
against the Union and the Times. In particular, the District
Court's dismissal of the LMRA and LMRDA claims was
based on its finding that the appellants' complaints to the
Union regarding their alleged mistreatment by Times'
personnel were being presented to the Baar Committee at
the same time that they were before the District Court. See
Anjelino, 1993 WL 170209 at *13-14. Under these
circumstances, we find that dismissal of the LMRA claims
was appropriate. See Angst v. Mack Trucks, Inc., 969 F.2d
1530, 1538 (3d Cir. 1992) (holding that union members
were required to exhaust grievance and arbitration
procedures contained in CBA prior to filing suit under
LMRA); see also Clayton v. Int'l. Auto. Workers, 451 U.S.
679, 692 (1981).

For the same reason, we will affirm the dismissal of the
LMRDA claims. See Pawlark v. Greerwalt, 628 F.2d 826,
830-31 (3d Cir. 1980), cert. denied, 449 U.S. 1083 (1981)
(stating that internal exhaustion requirement is not
absolute and reversing dismissal of LMRDA on record of
particular case, but noting that suits by union members
who cannot demonstrate a "valid reason" for failing to
exhaust internal procedures usually will be dismissed by
trial courts).

B. Matters Dismissed on Summary Judgment

In its Orders of August 22, 1996, and March 2, 1997, the
District Court dismissed, inter alia, the remaining Title VII

and NJLAD sex and race discrimination and retaliation claims of the non-Hispanic and Hispanic appellants, respectively, on summary judgment grounds. Thus, the court determined that there were no genuine issues of disputed material fact that precluded dismissal of these claims prior to trial. This ruling can no longer stand, however, because our rulings on failure to exhaust and lack of standing and our modification of the limitations period have reinstated as material many factual issues that were not considered by the District Court in its consideration of the motion for summary judgment. Because of the revival of disputed factual issues, summary judgment may no longer be appropriate.

On remand, the District Court must review these issues in light of Rule 12(b)(6) and Rule 56 standards. We caution the District Court that, in doing so, it may need to reconsider its prior ruling that the Baar Award is sufficient in and of itself to constitute a "legitimate, nondiscriminatory reason for rejection." We add this note of caution because of the expansion of the relevant time period to be considered and the impact that further factual development may have on this conclusion by the District Court. We point in particular to the findings of the 1988 Adelman Award concerning the standards of enforcement over the years of the Baar Award. See App. at 124-137. The issue of whether the Baar Award has been enforced and/or strictly complied with may affect the disparate treatment and the disparate impact claims.

C. Collateral Issues

1. Discovery

The District Court's denial of the appellants' motion for further discovery was based on representations made by appellants' counsel to a magistrate judge in an affidavit opposing a motion to dismiss the case. In the affidavit, counsel stated that "[p]laintiffs are prepared to go to trial at this time, and do not require further discovery." App. at 688. The District Court found this declaration to be a "tactical decision, made in the particular context [of a motion to dismiss], to forgo the obvious advantages of discovery in order to move the litigation forward . . .." App.

42

at 25. Applying the doctrine of judicial estoppel, which the court characterized as designed "to prevent litigants from engaging in precisely this kind of `tactical' decision-making," the court refused the appellants' request to overturn the magistrate's order denying them further discovery.

The appellants argue on appeal that the District Court abused its discretion in affirming the order denying them discovery. They claim that counsel's statement that no further discovery was needed was based on the assumption that no party would be granted further discovery; they assert that it was not inconsistent with prior representations by counsel or made in bad faith. For this reason, they urge that the court should not have affirmed the order on grounds of judicial estoppel. The appellants argue that, by allowing the appellees to proceed with discovery while denying the same to them, the District Court "profoundly changed the balance between the parties."

We find, however, that the District Court did not abuse its discretion by holding counsel to the representation that no further discovery was needed. On the basis of the record before us, we find no cause for disturbing the court's application of judicial estoppel to "preserve the integrity of the courts by preventing litigants from `playing fast and loose with the courts.' " Anjelino, No. 92-2582 (Jan. 29, 1996) at 3 (quoting Scarano v. Central R.R. Co. of New Jersey, 203 F.2d 510, 513 (3d Cir. 1953)); accord McNemar v. Disney Store, Inc., 91 F.3d 610, 616-17 (3d Cir. 1996); Lewandowski v. Nat'l R.R. Passenger Corp., 882 F.2d 815, 819 (3d Cir. 1989). The District Court's order denying discovery to appellants' counsel is affirmed.

2. Sanctions

Although a trial court has considerable discretion in imposing sanctions, it is settled law that an attorney must have notice and an opportunity to be heard on the possibility of being sanctioned, consistent with the mandates of the due process clause of the Constitution. Martin v. Brown, 63 F.3d 1252, 1262-64 (3d Cir. 1995). The requisite notice must be "particularized" so that a party is

43

aware of the "particular factors that he must address if he is to avoid sanctions." Jones v. Pittsburgh Nat'l Corp., 899 F.2d 1350, 1357 (3d Cir. 1990). We have vacated orders imposing sanctions where we found that notice was not sufficiently particularized. For instance, we will consider it an abuse of a district court's discretion if it does not made it clear that an attorney might be sanctioned pursuant to 28 U.S.C. S 1927,33 which requires a finding of bad faith for the imposition of sanctions, see Hackman v. Valley Fair, 932 F.2d 239, 241-42 (3d Cir. 1991), as distinguished from Rule 11, Fed.R. Civ.P., which does not require such a finding, see Fellheimer, 57 F.3d at 1225. Accord Martin, 63 F.3d at 1262-64.

Moreover, sanctions relating to abuse of the discovery process must reflect reasonable costs incurred as a result of an attorney's misconduct. See Martin, 63 F.3d at 1262-64. In order to facilitate our review of orders imposing sanctions on this ground, we therefore require that a district court make explicit the basis for its imposition of discovery related sanctions. It is impossible for us to determine whether a court has exercised sound discretion in imposing sanctions if the record does not provide a justification for the order. Id. at 1264.

After reviewing these prerequisites for the imposition of sanctions, we find that the District Court's order imposing sanctions upon appellants' counsel must be vacated. Although the court's order to show cause regarding the possibility of sanctions states the court's view that appellants' motion to reconsider was "an improper rehashing of issues already decided," the order to show cause did not give notice as to the legal basis for the possible sanctions. App. at 30. For instance, it did not refer to 28 U.S.C. S 1927. The District Court's failure to give particularized notice to counsel was inconsistent with our precedent. See Martin, 63 F.3d at 1264; Jones, 899 F.2d at 1358.

_____

33. This statute states, in pertinent part, that "any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct." 28 U.S.C. S 1927.

44

Moreover, while the order imposing sanctions did set forth the statutory basis for the court's action, the $5,000 penalty imposed by the court was not based upon an assessment of reasonable costs of counsel's misconduct. This, too, is grounds for our finding that the Court abused its discretion in imposing sanctions upon appellants' counsel. Martin, 63 F.3d at 1262-64.

V. Conclusion

For the foregoing reasons, we will reverse in part and affirm in part the District Court's orders dismissing the Amended Complaint, and we will remand this case for further proceedings consistent with this opinion.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit